BADIEE v BRIGHTON AREA SCHOOLS

Docket Nos. 247437, 248270, 249881. Submitted November 17, 2004, at Lansing. Decided March 1, 2005, at 9:00 a.m.

Hebat Badiee and Spartan Technical Services, Inc., the latter doing business as Laser Electric, brought an action in the Livingston Circuit Court against the Brighton Area Schools (BAS) and the George W. Auch Company, alleging breach of contract, ethnic intimidation, civil rights violation, intentional interference with a business relationship and with a contractual relationship, and a third-party beneficiary claim. Badiee was an employee of Laser, and the claims related to contracts awarded to Laser for electrical work for the renovation or construction of schools in Brighton. Auch was the construction manager. Auch counterclaimed against Laser on the discrimination claims, alleging that Laser was required to indemnify Auch against Badiee's discrimination claims. The court, Daniel A. Burress, J., granted Laser summary disposition on the counterclaim, determining that public policy prohibited indemnification for civil rights violations. Subsequently, the plaintiffs' claims were all resolved in the defendants' favor by means of summary disposition, directed verdict, or jury verdict. The plaintiffs moved for judgment notwithstanding the verdict, which the court denied. The court granted case-evaluation sanctions to BAS and costs to the defendants. The plaintiffs appealed the orders granting the defendants' motions for summary disposition and directed verdict, denying their motion for judgment notwithstanding the verdict, and awarding case-evaluation sanctions and costs. Auch appealed the order granting summary disposition for Laser on the counterclaim.

The Court of Appeals *held*:

1. The trial court properly granted summary disposition in Laser's favor on the counterclaim, although not for the reason given by the trial court. The contracts in question provided indemnification only for claims arising from Laser's conduct in connection with the agreement and did not cover Auch's actions.

2. The trial court did not abuse its discretion in excluding irrelevant evidence or in admitting the testimony of qualified expert witnesses with whom the plaintiffs disagreed.

3. The trial court properly granted the defendants summary disposition on the plaintiffs' claim of ethnic intimidation and directed verdicts on the plaintiffs' civil rights claim because the statutes did not apply to the facts offered at trial.

4. The plaintiffs failed to establish that their evidence on the breach of contract claim was so substantial that the jury had no reasonable choice but to accept the plaintiffs' version. There was sufficient evidence to support the defendants' reasons for delaying payment. Nor did the plaintiffs prove that Auch did anything to interfere with the contracts between Laser and BAS. The contracts did not give Laser third-party beneficiary status.

5. The trial court did not err in awarding case-evaluation sanctions. BAS timely filed its request for sanctions. MCR 2.403(O) does not require that the request for actual costs, including a reasonable attorney fee, specify the amount of the costs with particularity. BAS submitted an affidavit outlining what it thought to be the reasonable attorney fee incurred before the hearing on the request, and the trial court determined the amount of actual costs as required by the court rule. The trial court also did not abuse its discretion in awarding costs, which were not excessive.

Affirmed.

COSTS — CASE-EVALUATION SANCTIONS — PARTICULARITY OF REQUEST.

A party requesting actual costs, including reasonable attorney fees, following rejection of a case evaluation is not required to specify the amount of actual costs with particularity in the request, but may submit the information necessary for the trial court to determine actual costs before the hearing on the request (MCR 2.403[O][8]).

*Loomis, Ewert, Parsley, Davis & Gotting, P.C.* (by *Jeffrey S. Theuer* and *Lisa A. Hanson*), for Hebat Badiee and Spartan Technical Services, Inc.

*Foster, Swift, Collins & Smith, P.C.* (by *William R. Schulz* and *John P. Nicolucci*), for the Brighton Area Schools.

*Plunkett & Cooney, P.C.* (by *Ernest R. Bazzana*), for the George W. Auch Company.

Before: GRIFFIN, P.J., and SAAD and O'CONNELL, JJ.

SAAD, J. In Docket No. 247437, defendant George W. Auch Company (Auch) appeals from an order that granted summary disposition in favor of plaintiff Spartan Technical Services, Inc., doing business as Laser Electric (Laser), with respect to Auch's counterclaim for contractual indemnity. In Docket No. 248270, Laser and plaintiff Hebat Badiee appeal from the trial court's judgment in favor of Auch and defendant Brighton Area Schools (BAS) on all of plaintiffs' claims in the instant action. In Docket No. 249881, plaintiffs appeal from the trial court's order that awarded defendants costs and case-evaluation sanctions. These three cases were consolidated on appeal,[1] and we affirm the trial court's orders.

## I. FACTS AND PROCEDURAL HISTORY

BAS entered into a contract with Auch on November 20, 1998, under which Auch would act as construction manager for the renovation or new construction of seven schools in the Brighton area. In the fall of 1999, Laser, of which Badiee is executive vice president,[2] bid for and was awarded seven separate contracts to do the electrical work at the seven schools. The total combined contract price was approximately $1.1 million.

To accommodate the academic calendar, the project was set to begin on November 29, 1999, and was to be completed no later than August 26, 2000. In January of

---

[1] *Badiee v Brighton Area Schools*, unpublished order of the Court of Appeals, entered June 26, 2003 (Docket Nos. 247437 and 248270); *Badiee v Brighton Area Schools*, unpublished order of the Court of Appeals, entered August 13, 2003 (Docket Nos. 247437, 248270, and 249881).

[2] Badiee is not an owner of this corporation. His wife, Lisa Badiee, was the president and sole stockholder. The corporation was initially formed not as a construction business, but as a word-processing business, and later began doing business as Laser. Lisa Badiee has no construction experience.

2000, Auch personnel expressed concerns about the quality of Laser's work, its available staffing, and its ability to complete work on schedule. Accordingly, a meeting was held on February 1, 2000, at one of the job sites. Badiee claims that at this meeting, Auch vice president Thomas Hickey directed an ethnic slur at Badiee, who is of Iranian descent.[3] Hickey denied making ethnocentric slurs, and testified that when he arrived at the job site on February 1, 2000, for the meeting, he found Badiee in Auch's trailer, speaking at length to the Auch project manager and construction superintendents. Hickey testified that, in response to Auch's concerns that Badiee did not have enough people on the job and that those present were not adequately supervised, Badiee proceeded "in a very dismissive and very demeaning manner" to tell the Auch personnel "that they didn't know really what they were doing . . . ." As a result of the meeting, plaintiffs and Auch reached an agreement to alleviate several of the concerns Auch raised.[4] Auch sent plaintiffs a letter on February 4, 2000, memorializing these agreements. In particular, Auch required Laser to (1) provide copies of state electrician licenses for Laser personnel respon-

---

[3] Specifically, plaintiffs claimed at trial that Hickey said of Badiee, in his presence, that Hickey "wished he had not hired a sand n———r as a subcontractor."

[4] One of the concerns Auch raised is that it did not appear that Laser would have a sufficient work force during the summer months, when school would not be in session. Because the buildings were schools, the bulk of the work would be delayed until school ended for the summer. Auch was concerned that labor would be hard to find with other large projects requiring large work forces, notably the Detroit casinos, planned for the summer of 2000. Badiee assured Auch that he would be able to find enough personnel through a professional organization, and by hiring subcontractors. Ultimately, when summer arrived, Laser was unable to find sufficient labor and had to ask Auch for help in locating sufficient personnel. Auch assisted Laser in contacting several electrical subcontractors.

sible for the projects,[5] (2) correct defective work, (3) update its schedule to accurately reflect progress at each school, (4) provide consent of surety letters for payment applications, and (5) provide state electrical permits for each project. Auch's letter concluded by stating that payments would not be released until these requirements were met. A second meeting took place on February 10, 2000, with representatives from BAS, Auch, and Laser, to further clarify the requirements spelled out in the February 4, 2000, letter, and Auch sent a second letter to memorialize that meeting.

On February 14, 2000, Laser sent what proved to be the first of several letters in which it threatened to walk off the job. The February 14 letter cited Auch's alleged failure to pay Laser on its first payment application. Laser sent Auch a second letter on February 16, 2000, threatening to walk off the job. However, the delay in payment appeared to result from a combination of Laser not fulfilling the conditions agreed to at the February 1, 2000, meeting[6] and the fact that Laser overstated its "general conditions" expenses by nearly $41,000.[7] Ultimately, the payment application was ap-

---

[5] The letter cited as authority 1999 AC R 408.30801 *et seq.*, which requires a licensed electrician to be present to oversee electrical installations, R 408.30820. As will be discussed in greater detail below, Laser apparently allowed unlicensed apprentice electricians to do electrical work in violation both of the state regulation and the contract between Laser and BAS.

[6] For example, Laser had two licensed electricians on its staff. Laser gave Auch two licenses, but one was expired. When Auch asked Laser for a current license for the employee whose license had expired, Badiee replied that Auch could check with the state itself, something that, according to Hickey, it never had to do. Eventually Badiee provided a valid license.

[7] Apparently, Laser had invoiced the entire amount of the "general conditions" expenses provided for in the contract. These amounts were intended to reimburse Laser for such necessary expenses as bond costs,

proved for one hundred percent of the costs related to labor and materials and for that portion of the "general conditions" amount requested that reflected expenses Laser had actually incurred.

As a result of Laser's poor performance, apparent labor difficulties, and threats to stop work, Auch felt the need to scrutinize Laser's work more closely. And, because of these concerns, Auch required Laser to submit consent of surety letters with each of its future payment applications, which it did for the second through sixth applications.[8] In addition to the BAS projects, Laser was under contract to perform electrical work for the Michigan Department of Transportation (MDOT) and Michigan State University (MSU).[9] Laser employee Mike Beach, one of the two licensed electricians employed by Laser, split his time between the BAS projects and the MDOT project. Laser began to fall behind schedule, and there were workmanship concerns at several of the project sites.[10] Unsupervised, unlicensed apprentice electricians were performing much of the electrical work.

---

clerical support, and permit fees as Laser incurred them. Laser apparently inappropriately attempted to acquire these funds up-front.

[8] Laser was not able to provide a consent of surety for its seventh application, which led Auch to withhold payment and ultimately precipitated the instant action.

[9] Laser had expected both projects to be completed by January 2000; however, both continued into the summer of 2000. Furthermore, Laser employee John McDonald, an unlicensed apprentice electrician with little estimating experience, did the estimation work for the BAS projects. Apparently, McDonald assumed that only one licensed electrician would be required for all seven BAS contracts, whereas state regulations require at least one licensed electrician at each worksite where electrical work is being done. Essentially, by the summer of 2000, Laser had only two licensed electricians to supervise nine projects. MDOT and MSU ultimately terminated their contracts with Laser.

[10] Including, notably, an incident in which two pipefitters working on one of the school buildings were nearly electrocuted.

On July 6, 2000, Laser sent another letter threatening to stop work apparently as a result of the nonpayment of its seventh payment application dated June 30, 2000. In addition to not being able to submit a consent of surety as required, Laser apparently represented that it made payments to suppliers in excess of amounts those suppliers actually received. After Auch's accounting department spent several hours working with Laser's bookkeeper to reconcile this discrepancy, Auch eventually released payment in the form of a check payable jointly to Laser and its vendors. Significantly, by mid-July 2000, it became apparent to Auch that Laser was behind schedule and would not complete its work before August 26, 2000, the date that school was set to begin. An emergency meeting of representatives from Auch, Laser, and BAS resulted in a promise from Badiee that Laser would submit a plan for finishing the project by July 24, 2000. Laser never submitted this plan. Instead, it sent yet another letter threatening to stop work, dated July 28, 2000, and on August 4, 2000, Laser walked off the job.

After Laser left the job, Auch and BAS filed a claim with Merchant's Bonding, Laser's surety. Rather than bid the contracts out again with only three weeks left before the beginning of the school year, Auch "left the contracts" in place, and relied on Ted Krawzynski Electric, Laser's electrical subcontractor,[11] as well as two other subcontractors, to finish the job using the amount of money remaining under the contracts.

Auch paid the Laser employees, subcontractors, and vendors a total of approximately $717,000 for work performed after Laser stopped work. Laser was paid approximately $493,000, representing the amount of

[11] Several Laser employees joined Ted Krawzynski Electric to finish the work after Laser left the job.

work it had performed. Auch repaid approximately $128,000 to Merchant's Bonding.[12]

Plaintiffs filed the instant action on July 16, 2001, and alleged several counts related to what Laser characterized as defendants' breach of contract, one count that alleged both ethnic intimidation, MCL 750.147b, and ethnic discrimination in violation of the Civil Rights Act (CRA), MCL 37.2101 *et seq.*, counts of intentional interference with a business relationship and intentional interference with a contractual relationship, and a third-party beneficiary claim.

Auch filed a counterclaim against Laser with respect to the discrimination claim, and alleged that Laser's contracts with BAS required Laser to indemnify Auch against Badiee's ethnic-discrimination claim. Plaintiffs moved for summary disposition on the counterclaim, and Auch argued in response that, in fact, it was entitled to summary disposition on its counterclaim. The trial court ruled that Auch could not be indemnified by Laser for Auch's alleged ethnic discrimination against Badiee because Michigan's public policy prohibits indemnification of such civil rights violations.

At trial, all of plaintiffs' claims were resolved in defendants' favor by way of summary disposition, directed verdict, and jury verdict. Plaintiffs filed a post-judgment motion for judgment notwithstanding the verdict (JNOV), which the trial court rejected.

Auch appeals from the trial court's order that rejected its indemnity claim. Plaintiffs appeal from several orders that grant defendants' motions for summary disposition and directed verdict, and from an order that denied their motion for JNOV. Plaintiffs further appeal

---

[12] This apparently represents funds paid from the bond that were not needed to finish Laser's work.

from orders granting case-evaluation sanctions granted to BAS and costs to defendants.

## II. CONTRACTUAL INDEMNITY

### A

After plaintiffs filed the complaint, Auch filed a counterclaim and sought an order to compel Laser to indemnify Auch against Badiee's civil rights claim. Laser filed a motion for summary disposition under MCR 2.116(C)(8) (failure to state a claim for which relief may be granted). The trial court granted summary disposition in favor of Laser because public policy does not allow an indemnitee to seek indemnity for the indemnitee's own acts of discrimination. Auch argues that the trial court erred because, contrary to the trial court's holding, Michigan law allows indemnification for one's own acts of discrimination, and that Auch was entitled to judgment on its indemnification claim.

### B

Motions for summary disposition under MCR 2.116(C)(8) test the legal sufficiency of a complaint. *Carmacks Collision, Inc v Detroit*, 262 Mich App 207, 208-209; 684 NW2d 910 (2004). This Court reviews a trial court's decision whether to grant a motion under subrule C(8) de novo. *Id.* at 209.

This Court construes indemnity contracts in the same manner it construes contracts generally. *Zurich Ins Co v CCR & Co (On Rehearing)*, 226 Mich App 599, 603; 576 NW2d 392 (1997). "An unambiguous contract must be enforced according to its terms." *Burkhardt v Bailey*, 260 Mich App 636, 656; 680 NW2d 453 (2004). If indemnity contracts are ambiguous, the trier of fact must determine the intent of the parties. *Sherman v*

*DeMaria Bldg Co, Inc*, 203 Mich App 593, 596; 513 NW2d 187 (1994). "While it is true that indemnity contracts are construed strictly against the party who drafts them and against the indemnitee, it is also true that indemnity contracts should be construed to give effect to the intentions of the parties." *Id.*

C

The trial court struck down the indemnity clause as a violation of public policy. However, because we hold that the indemnity provision is simply inapplicable to the factual predicate of Auch's claim, we need not address the public policy issue.[13]

The relevant contractual provision in the contracts between BAS and Laser reads as follows:

> The Contractor[14] shall indemnify and hold the Owner[15] and Construction Manager,[16] its past, present and future employees, officers, members of its Board of Trustees, agents and predecessor, successor and related entities, harmless from and against *any and all liabilities*, damages, fines, penalties, demands, forfeitures, *claims*, *suits, causes of actions* or any other liabilities of losses, including *all costs of defense, settlement and prosecution along with actual attorney, expert and other professional fees*, arising out of or related to *any* negligence, *wrongful act* or breach of this Agreement or the obligation of the Contractor or any of its employees or others for whom it is responsible in connection with this Agreement of [sic] the Project. The Contractor agrees to indemnify the Owner and Construction Manager and hold them harmless from

---

[13] However, we note that for purposes of insurance, parties can obtain policies covering intentional acts of discrimination. *North Bank v Cincinnati Ins Cos*, 125 F3d 983, 988 (CA 6, 1997).

[14] Laser.

[15] BAS.

[16] Auch.

all claim for bodily injury and property damage that may
arise from the Contractor's operations. [Emphasis added.]

Here, both plaintiffs and Auch contend that the
language quoted above is clear and unambiguous. How-
ever, plaintiffs argue that the language clearly states
that Auch can be indemnified only for misconduct on
the part of Laser, its employees, and its subcontractors,
and not for Auch's alleged misconduct. Auch, on the
other hand, contends that the language is broad and
clearly contemplates indemnity for *any wrongful act*,
even its own.

Indemnity clauses need not expressly mention the
indemnitee's own acts to provide coverage for them.
*Sherman, supra* at 596-597. However, this certainly
does not mean the court will automatically assume the
clause covers the indemnitee's acts; the goal of the court
is to determine the parties' intent from " 'other lan-
guage in the contract, surrounding circumstances, or
from the purpose sought to be accomplished by the
parties.' " *Id.* at 597, quoting *Fischbach-Natkin Co v
Power Process Piping, Inc,* 157 Mich App 448, 452; 403
NW2d 569 (1987).

In *Paquin v Harnischfeger Corp,* 113 Mich App 43,
52-53; 317 NW2d 279 (1982), this Court concluded that
an indemnity clause provided coverage for the claims
caused in part by the indemnitee's negligence because
of a specific exclusion for claims caused solely by the
indemnitee's negligence. In its analysis, this Court
noted that "[t]he fact that the clause expressly pre-
cluded indemnification in the even[t] that the injury or
damage was caused by [the indemnitee's] *sole* negli-
gence . . . indicates that the intent was to provide in-
demnity in all situations involving [the indemnitee's]
own negligence except wherein caused by [the indem-
nitee's] sole negligence." *Id.*

This Court also concluded that the contractual indemnity clause provided coverage for the indemnitee's own acts in *Fischbach*. The clause in question provided indemnity for " 'all liability or claimed liability for injuries, including death, to any and all persons whomsoever and for any and all property damage arising out of or resulting from or in any way connected with the work covered by this Subcontract . . . .' " *Fischbach, supra* at 450-451. This Court noted that the clause provided broad coverage, the parties were aware their employees would be working together, and "the possibility that an injury or damage would result from [the indemnitee's] negligence was apparent at the time the parties entered the contract providing for indemnification." *Id.* at 454-455.

The current clause, unlike that in *Paquin*, does not contain a provision excluding coverage for claims arising from the indemnitee's sole negligence. There also is a crucial distinction from *Fischbach*: the *Fischbach* clause provided indemnity for claims for personal injuries or property damage arising from work connected with the contract, while the current clause is much broader, as it provides indemnity for any claim.

Auch breaks the coverage of the provision into four components: indemnification for claims arising out of negligence, wrongful acts, breach of the agreement, and any obligation of Laser. Auch then argues the fourth component must be read independently of the other three, so that the first three components are not restricted to Laser. However, for the sentence concerning indemnification to make any meaningful sense, the components must all be read together.

There can be no question that the first three components must be read together. Although there is no language limiting the scope of the negligence and

wrongful acts coverage to claims arising from the agreement, obviously Laser did not intend to indemnify Auch for claims unrelated to contract work, a point conceded by Auch. Thus, the first two components must be read in conjunction with the third, which restricts coverage to claims arising from the agreement.

Likewise, the first three components must be read in conjunction with the fourth. Otherwise, because the clause provides indemnity for claims arising from breach of the agreement, Laser would be powerless to enforce the contract. This would be as ludicrous a result as Laser providing indemnification for claims not arising from work connected with the agreement. The four components must be read together, as providing coverage for claims arising from *Laser's conduct in connection with the agreement*.

Unlike *Paquin* and *Fischbach*, in which the contract language indicated an intent to cover the indemnitee's acts, the current language evidences an intent to cover only Laser's actions. Accordingly, we hold that the trial court properly granted summary disposition in favor of Laser on Auch's counterclaim, though it did so under an alternative ground.[17]

### III. EXCLUSION OF EVIDENCE

#### A

Plaintiffs assert that the trial court erroneously granted defendants' motion in limine, which prevented plaintiffs from offering evidence of alleged ethnic slurs that Badiee himself had not heard or been made aware of before the date he walked off the job. The trial court reasoned that plaintiffs could not support their "hostile

---

[17] See *Grand Trunk W R, Inc v Auto Warehousing Co*, 262 Mich App 345, 354; 686 NW2d 756 (2004).

work environment" claim by using evidence of alleged ethnic slurs that Badiee neither heard nor even learned of until well after he left the worksite. Plaintiffs argue that the motion in limine prevented them from adequately proving their hostile workplace claim, and that it prevented them from rebutting Auch's defenses to Laser's breach of contract claims or from establishing a motive for Auch's alleged interference with the business and contractual relationships between Laser and BAS.

Plaintiffs also argues that the trial court erroneously excluded evidence of the fact that the Michigan Department of Civil Rights did not award Auch a "certificate of awardability" because Auch did not hire enough minorities for it to qualify for state contracts.

B

The standard of review with respect to a trial court's decision whether to admit evidence is as follows:

> [This Court] review[s] a trial court's decision to admit or exclude evidence for an abuse of discretion. . . . However, any error in the admission or exclusion of evidence will not warrant appellate relief "unless refusal to take this action appears . . . inconsistent with substantial justice," or affects "a substantial right of the [opposing] party." [*Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004) (citations omitted).]

C

1

At trial, Badiee testified about two ethnic slurs directed toward him in his presence, and that an employee, John MacDonald, had told him of a third incident that allegedly occurred in March 2000. After

the trial court heard defendants' motion in limine, it allowed plaintiffs to recall Badiee, over defendants' objection. Badiee then testified that he had been told that several Auch employees had used ethnic slurs to refer to him.

Plaintiffs do not explain why evidence of alleged ethnic slurs, of which Badiee was not aware and to which he was not a witness, are relevant to his hostile workplace claim under the CRA. Plaintiffs' primary argument seems to be that the motion in limine was made in an untimely manner contrary to the trial court's pretrial scheduling order. Plaintiffs offer no explanation or authority to support this position. A party may not simply announce its position and "leave it to this Court to discover and rationalize the basis for the party's claim." *Conlin v Scio Twp*, 262 Mich App 379, 384; 686 NW2d 16 (2004).

The trial court did not abuse its discretion when it excluded the evidence. We agree with defendants and the trial court that evidence of ethnic slurs that Badiee neither witnessed nor knew about is not relevant to his claim that defendants created a hostile workplace in violation of the CRA. Moreover, Badiee was able to testify before the jury that Auch employees used ethnic slurs to refer to him in his presence, and that he was made aware of other instances in which Auch employees allegedly used ethnic slurs to refer to him. Thus, the evidence excluded was cumulative. Any error resulting from the exclusion of cumulative evidence is harmless. *Dunn v Nundkumar*, 186 Mich App 51, 54; 463 NW2d 435 (1990).

Accordingly, we hold that the trial court did not abuse its discretion when it granted defendants' motion in limine.

2

Plaintiffs sought to admit evidence of the fact that the Michigan Department of Civil Rights did not award a certificate of awardability to Auch in 1997 because it did not hire enough minority employees to qualify for contracts paid for with state funds.[18] During the hearing on defendants' motion to exclude the evidence, plaintiffs conceded that the evidence was relevant only to Auch employees, and not to subcontractors with whom Auch worked. Plaintiffs also conceded that Auch had received a certificate by the time Laser joined the project. On the basis of these concessions, plus the trial court's ruling that the evidence was not relevant because this was not a hiring case and because there was evidence that Auch actually recommended Laser for the BAS projects twice, the trial court granted the motion.

This evidence is irrelevant because this is not a hiring case, and plaintiffs have not demonstrated how they were prejudiced by the exclusion of this evidence. Indeed, plaintiffs were permitted to present evidence to the jury in support of their contention that defendants engaged in racially discriminatory conduct.

Accordingly, we hold that the trial court did not abuse its discretion when it excluded this evidence, and, were we to conclude there was error, that error would be harmless.

### IV. DIRECTED VERDICT WITH RESPECT TO BADIEE'S CIVIL RIGHTS CLAIMS

Plaintiffs maintain that the trial court erroneously granted defendants' motion for directed verdict with

---

[18] Plaintiffs sought to admit handwritten notes of the Department of Civil Rights employee who reviewed Auch's application for the certificate of awardability.

respect to plaintiffs' discrimination claims. Plaintiffs' civil rights count alleged violations of both the ethnic intimidation statute, MCL 750.147b,[19] and the CRA, specifically MCL 37.2202, 37.2209, 37.2302, and 37.2402. This Court reviews de novo a trial court's decision with respect to a motion for directed verdict. *Merkur Steel Supply, Inc v Detroit*, 261 Mich App 116, 123; 680 NW2d 485 (2004). Motions for directed verdict may be granted only "when no material factual questions exist on which reasonable minds could differ." *Id.*

On appeal, plaintiffs do little more than state that the trial court erred when it granted the motion for directed verdict, then quote verbatim the relevant statutory sections. Plaintiffs do not present any case law in support of their argument, any authority that explains the elements of the alleged torts, or even any explanation whatsoever of their argument. A party waives an issue when it gives the issue cursory treatment on appeal. *Blazer Foods, Inc v Restaurant Prop-*

---

[19] The ethnic intimidation statute provides:

A person is guilty of ethnic intimidation if that person maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin, does any of the following:

(a) Causes physical contact with another person.

(b) Damages, destroys, or defaces any real or personal property of another person.

(c) Threatens, by word or act, to do an act described in subdivision (a) or (b), if there is reasonable cause to believe that an act described in subdivision (a) or (b) will occur. [MCL 750.147b(1).]

Though this is a criminal statute, it provides for a civil action for a person who is a victim of the crime of ethnic intimidation without regard to "the existence or outcome of any criminal prosecution . . . ." MCL 750.147b(3).

*erties, Inc,* 259 Mich App 241, 252; 673 NW2d 805 (2003). Furthermore, a party may not simply announce its position and "leave it to this Court to discover and rationalize the basis for the party's claim." *Conlin, supra* at 384. Moreover, the facts presented at trial simply do not support plaintiffs' civil rights claims.

### A. ETHNIC INTIMIDATION

Plaintiffs conceded during the motion for directed verdict that this claim applied only to Badiee. Badiee himself testified to only two instances in which ethnic slurs were allegedly directed at him. There is no evidence that either of these slurs accompanied any actual or threatened harm to Badiee or his property. Accordingly, no reasonable jury could conclude that defendants engaged in conduct that violated the ethnic intimidation statute, and the trial court properly granted summary disposition.

### B. HOSTILE WORKPLACE

#### 1. CRA SECTION 202

An "employer" is "a person who has 1 or more employees, and includes an agent of that person." MCL 37.2201(a). Claims against an employer under § 202[20] may only be brought by employees. *Kamalnath v Mercy Mem Hosp Corp,* 194 Mich App 543, 553; 487 NW2d 499

---

[20] CRA § 202 provides, in relevant part:

An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. [MCL 37.2202(1).]

(1992). An independent contractor is not an employee, and may not bring a claim against an employer under § 202. *Id.*

Here, Badiee's employer was neither BAS nor Auch, but Laser. Plaintiffs do not argue that BAS or Auch was an agent of Laser. Laser cannot sustain a claim against BAS or Auch under § 202 because it is not an "individual" and because it is at best an independent contractor of BAS. Because neither BAS nor Auch was plaintiffs' "employer" for the purposes of § 202, we hold that the trial court properly granted a directed verdict in favor of defendants.

### 2. CRA SECTION 209

As discussed above, plaintiffs are not employees of defendants for the purposes of the CRA. Moreover, the plain language of § 209[21] provides that a contractor may not discriminate against *its* employees, and provides for a breach of contract action when a contractor does discriminate against an employee. In other words, BAS would have a breach of contract action against *Laser* only when *Laser* discriminated against Badiee (or another employee). In light of plaintiffs' allegations, and the facts presented to the jury, § 209 does not apply

---

[21] Section 209 provides:

A contract to which the state, a political subdivision, or an agency thereof is a party shall contain a covenant by the contractor and his subcontractors not to discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, or marital status. Breach of this covenant may be regarded as a material breach of the contract. [MCL 37.2209.]

here. Accordingly, we hold that the trial court properly granted defendants' motion for directed verdict.

### 3. CRA SECTION 302

BAS cites *Kassab v Michigan Basic Prop Ins Ass'n*, 441 Mich 433, 440-441; 491 NW2d 545 (1992), in support of its argument that the public accommodation provision of § 302[22] does not apply here. Though our Supreme Court was addressing a claim that a denial of insurance benefits violated the public accommodation provision of § 302, BAS asserts, and we agree, that the Court's reasoning applies here by analogy. The Court in *Kassab* stated:

> [I]t is beyond the legislative purpose to provide a civil rights action under the public accommodations section of the act for breach of contract in claims processing. Upon the issuance of a policy of insurance, the services owed by an insurer to an insured are no longer "services ... made available to the public." The rights and obligations of the contracting parties are then private. While an insured is not separated from the "public" upon entering into insuring agreements embodied in a policy of insurance, the obligations of the insurer are owed to a particular contracting party/insured. The rights and obligations of the contracting parties are specific to the contract and to the persons involved. [*Kassab, supra* at 441.]

By analogy, to the extent that the "right" to perform the electrical work for BAS may have been a " 'service [] . . .

---

[22] Section 302 provides, in relevant part:

Except where permitted by law, a person shall not:

(a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302.]

made available to the public,' " referring to the defini-
tion of "place of public accommodation" under § 301,
MCL 37.2301(a), it lost that status when Laser and BAS
entered into their contracts whereby Laser would per-
form those services. Accordingly, we conclude that § 302
does not apply to the facts of this case, and hold that the
trial court properly granted defendants' motion for
directed verdict.

4. CRA SECTION 402

The plain language of § 402[23] clearly shows that it
applies to conduct between a school and its students or
prospective students. Plaintiffs were neither students
nor prospective students of BAS's elementary schools.

---

[23] Section 402 provides:

An educational institution shall not do any of the following:

(a) Discriminate against an individual in the full utilization of
or benefit from the institution, or the services, activities, or
programs provided by the institution because of religion, race,
color, national origin, or sex.

(b) Exclude, expel, limit, or otherwise discriminate against an
individual seeking admission as a student or an individual enrolled
as a student in the terms, conditions, or privileges of the institu-
tion, because of religion, race, color, national origin, or sex.

(c) For purposes of admission only, make or use a written or
oral inquiry or form of application that elicits or attempts to elicit
information concerning the religion, race, color, national origin,
age, sex, or marital status of a person, except as permitted by rule
of the commission or as required by federal law, rule, or regulation,
or pursuant to an affirmative action program.

(d) Print or publish or cause to be printed or published a
catalog, notice, or advertisement indicating a preference, limita-
tion, specification, or discrimination based on the religion, race,
color, national origin, or sex of an applicant for admission to the
educational institution.

Accordingly, we hold that the trial court properly granted defendants' motion for directed verdict because § 402 does not apply to the facts of this case.

### V. PLAINTIFFS' BREACH OF CONTRACT CLAIM

Plaintiffs allege that the trial court improperly denied plaintiffs' motion for JNOV. We review de novo motions for JNOV in the light most favorable to the nonmoving party to determine whether the facts and evidence presented preclude judgment for the nonmoving party as a matter of law. *Merkur, supra* at 123-124.[24]

Laser submitted its seventh payment application for work it performed in June 2000. The evidence presented reflected that defendants had numerous reasons for delaying payment on that application. Laser did not provide a consent of surety with its seventh application before leaving the job on August 4, 2000,[25] as it had with its previous applications.[26] Evidence was presented that

---

(e) Announce or follow a policy of denial or limitation through a quota or otherwise of educational opportunities of a group or its members because of religion, race, color, national origin, or sex. [MCL 37.2402.]

[24] The trial court granted summary disposition in favor of Auch on plaintiffs' breach of contract count on the ground that there was no contract between Auch and Laser. Plaintiffs do not challenge this ruling on appeal. Accordingly, only Laser's breach of contract claim against BAS went to the jury.

[25] We note that, despite the record showing that Laser did, indeed, walk off the job, on appeal, plaintiffs repeatedly characterize the facts as reflecting that Laser and Badiee had been "removed" from the job.

[26] Plaintiffs claim that Auch had no right to require consent of surety. However, § 9.3.1 of the general conditions of the contracts between Laser and BAS required Laser to provide "such data substantiating the Contractor's right to payment as the Owner Construction Manager or Architect may require. . . ." Hickey testified that Auch asked Laser to provide consents of surety with payment applications after concerns

the seventh application requested significantly more money as payment to vendors than the vendors acknowledged receiving. Because of concerns that vendors were not being paid, Auch ultimately found it necessary to issue checks to Laser and its vendors jointly. After plaintiffs left the job, defendants filed a claim against Laser's performance bond and paid other workers to complete the contract work in time for the beginning of the school year.

Because plaintiffs bore the burden of proving their breach of contract claim, to sustain their motion for JNOV, plaintiffs were essentially required to establish that the evidence they presented was so substantial that the jury had no reasonable choice but to accept plaintiffs' version. Viewed in the light most favorable to defendants, the evidence presented was sufficient to allow a reasonable jury to find in defendants' favor. Accordingly, we hold that the trial court properly denied plaintiffs' motion for JNOV with respect to the breach of contract count.

### VI. PLAINTIFFS' CLAIM OF INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

Plaintiffs contend that the trial court erroneously denied plaintiffs' motion for JNOV with respect to plaintiffs' claim of intentional interference with business relations.

> "The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and result-

---

arose because of defects in Laser's work, Laser's early threats to walk off the job, and Laser's apparent inability to secure an adequate work force.

ant damage to the plaintiff. To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. *Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference.*" [*Mino v Clio School Dist*, 255 Mich App 60, 78; 661 NW2d 586 (2003), quoting *BPS Clinical Laboratories v Blue Cross & Blue Shield of Michigan (On Remand)*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996) (emphasis added).]

Plaintiffs claim that the fact that Auch delayed payment on the seventh application conclusively established plaintiffs' claim of intentional interference with business relations claim. However, defendants presented credible evidence that Auch had reasonable business reasons for delaying payment, such as Laser's failure to present a consent of surety as it had for the second through sixth payment applications, and the fact that Auch discovered that Laser had claimed to have paid its vendors significantly more money than the vendors certified receiving in their releases of liens.

Accordingly, viewing the evidence in the light most favorable to defendants, the jury had sufficient evidence to justify its verdict in favor of defendants on this claim and, therefore, the trial court properly denied plaintiffs' motion for JNOV.

### VII. PLAINTIFFS' CLAIM OF INTERFERENCE WITH CONTRACTUAL RELATIONS

Plaintiffs also argue that the trial court erred when it granted defendants' motion for directed verdict with respect to plaintiffs' claim of interference with a contract. "The elements of tortious interference are (1) a contract, (2) a breach, and (3) an unjustified instigation of the breach by the defendant." *Mahrle v Danke*, 216

Mich App 343, 350; 549 NW2d 56 (1996). " '[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.' " *CMI Int'l, Inc v Intermet Int'l Corp*, 251 Mich App 125, 131; 649 NW2d 808 (2002), quoting *Feldman v Green*, 138 Mich App 360, 378; 360 NW2d 881 (1984). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Prysak v R L Polk Co*, 193 Mich App 1, 12-13; 483 NW2d 629 (1992). "If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *CMI Int'l, supra* at 131.

To sustain this claim, plaintiffs were required to prove either that Auch committed an act that was so wrongful that Auch had no justification whatsoever for committing that act, and did so with malice and the intent to induce BAS to breach its contracts with Laser, or that Auch committed a lawful act with malicious intent to instigate BAS to breach its contracts with Laser. The trial court ruled that plaintiffs failed as a matter of law to prove that Auch did anything with the intent to interfere with the contracts between BAS and Laser.

The evidence presented at trial was not sufficient to allow a reasonable jury to conclude that Auch committed an act that was wrongful per se with the intent to induce BAS to breach its contracts with Laser. Furthermore, the evidence was insufficient to allow a reasonable jury to find that plaintiffs had presented evidence of specific, affirmative, unjustified acts with the intent to induce BAS to breach its contracts with Laser. To the

extent that the alleged use of ethnic slurs by Auch personnel may have constituted an act that was wrongful per se, plaintiffs presented no evidence that would allow a reasonable jury to conclude that Auch intended its use of ethnic slurs to induce BAS to breach its contracts with Laser, nor did plaintiffs even show that this act actually induced BAS to breach the contractual relationship between it and Laser. Indeed, as discussed earlier, plaintiffs failed to establish that there was even a breach of the contracts by BAS.

We conclude that Laser failed to present evidence to counter defendants' evidence that Auch's actions were undertaken for valid business reasons, and that plaintiffs failed to present any evidence that would allow a reasonable jury to conclude that Auch acted with the intent to induce BAS to breach its contracts with Laser.

Accordingly, we hold that the trial court properly granted defendants' motion for directed verdict.

### VIII. PLAINTIFFS' THIRD-PARTY BENEFICIARY CLAIM

Plaintiffs argue that the trial court improperly granted summary disposition in favor of defendants with respect to plaintiffs' third-party beneficiary claim. We review de novo a grant or denial of summary disposition to determine whether the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

The general conditions clause cited by plaintiffs in support of their third-party beneficiary claim is § 9.6.2, which provides, in relevant part, "The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work . . . ." The contracts between Laser and BAS identify Laser as "the Contractor," while Auch is

identified as "the Construction Manager" and BAS is identified as "the Owner." The contract between BAS and Auch similarly identifies Auch as "the Construction Manager" and BAS as "the Owner," and outlines Auch's duties with respect to "Contractors." The plain language of § 9.6.2, then, requires that *Laser* "promptly pay" its own subcontractors, not that Auch promptly pay Laser.

Furthermore, "[c]ontractors, subcontractors, and their employees are generally held not to be the third-party beneficiaries of the contract between the general or supervisory contractor and the project owner." *Dynamic Construction Co v Barton Malow Co*, 214 Mich App 425, 428; 543 NW2d 31 (1995). In *Dynamic Construction*, this Court reversed an order that denied the defendants summary disposition on the plaintiffs' third-party beneficiary claim. This Court reached that conclusion because the contract between the project owner and the construction manager not only lacked evidence of an intent to create a third-party beneficiary status with respect to contractors, but also expressly disclaimed third-party beneficiary status with respect to contractors. Here, § 10.7 of the contract between BAS and Auch provides that "[n]othing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Construction Manager."

Accordingly, we hold that the trial court properly granted summary disposition in favor of defendants with respect to plaintiffs' third-party beneficiary claim.

### IX. EXPERT WITNESS TESTIMONY

#### A. ALFRED SCHAER

Plaintiffs assert that the trial court abused its discretion when it overruled plaintiffs' objections to the

testimony of Alfred Schaer, an expert witness for defendants.

MRE 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence. This rule does not restrict the discretion of the court to receive expert opinion testimony subject to the condition that the factual bases of the opinion be admitted in evidence thereafter.

The trial court qualified Schaer, without objection, as an expert witness regarding contract administration and the bidding process in construction contracts. He is employed by a construction claims consulting firm, and is called upon to analyze the reasons for excessive costs or time for completion in projects.

The testimony to which plaintiffs object on appeal involves Schaer's analysis of the estimated date of completion had plaintiffs not left the job, which was based on the testimony of Auch witness Patrick Dunleavy, who had previously testified that plaintiffs had completed approximately sixty-two percent of the work when they left the project on August 4, 2000. Schaer testified that, on the basis of a rate of completion of approximately 7.75 percent a month and approximately thirty-eight percent of the work remaining, plaintiffs would not have finished the project until December 2000.[27] However, contrary to contentions by plaintiffs that Schaer used simply a straight-line method of computing a projected completion date, Schaer testified that he took into account Laser's July 2000 difficulty in obtaining adequate labor and that, depending on Laser's ultimate ability to secure additional labor, it might

---

[27] The record shows that these projects were to be completed before the August 26, 2000, opening of the school year.

have completed its work as early as October 2000. Evidence on the record showed that Laser had significant problems securing an adequate work force.

Plaintiffs' argument with respect to this issue is, essentially, that plaintiffs disagree with the substance of Schaer's testimony because it was contradicted by the testimony of other witnesses. However, this is precisely the purpose of trials—to submit contradictory evidence for a determination of which evidence is more credible. Our review of the record shows support on the record for Schaer's testimony. Plaintiffs were free to challenge Schaer's testimony on cross-examination (and they did), and were free to present any contrary evidence from their own experts (which plaintiffs appear not to have done). It appears that plaintiffs are attempting on appeal to characterize testimony with which they disagree as groundless speculation despite the fact that the trial court properly ruled that Schaer's testimony was based on facts in evidence. Accordingly, we hold that the trial court did not abuse its discretion when it overruled plaintiffs' objection to Schaer's testimony.

### B. PATRICK DUNLEAVY

Plaintiffs assert that the trial court abused its discretion when it admitted the testimony of Patrick Dunleavy, an expert witness for defendants. Dunleavy is a certified public accountant employed by a financial consulting firm that specializes in forensic accounting, fraud investigation, and litigation support. Dunleavy was asked by defendants to help determine the merits of plaintiffs' claim of damages.

At trial, plaintiffs objected to the admission of Dunleavy's testimony because he stated that he had not

consulted the state's prevailing wage statute[28] before rendering his opinion. However, Dunleavy testified that his opinion was based on the minimum wage provided for in the *contracts* between Laser and BAS and on Laser's payroll records, and that his testimony would be that Laser had not paid the minimum wage required by the *contracts*. The trial court overruled plaintiffs' objections because of Dunleavy's accounting experience, and ruled that, because Dunleavy was testifying not with respect to Laser's compliance with the statutory minimum wage but with respect to Laser's compliance with the contractual minimum wage, Dunleavy was qualified to testify. Plaintiffs' argument is not that Dunleavy lacks the expertise to examine Laser's payroll, but that Dunleavy was unqualified because of his apparent unfamiliarity with the prevailing wage statute.

On appeal, plaintiffs continue to insist that Dunleavy's testimony was improperly admitted because of his apparent lack of familiarity with Michigan's prevailing wage act (PWA), MCL 408.551 *et seq*. However, Laser's compliance with the PWA was not relevant to Dunleavy's testimony. Dunleavy testified that Laser failed to pay some of its employees the minimum wage required by the *contracts*, and plaintiffs do not argue that Dunleavy is unqualified to render such testimony, nor does the record reveal any reason that Dunleavy

---

[28] The Michigan prevailing wage act, MCL 408.551 *et seq.*, provides that contracts for certain state construction projects must pay a minimum wage based on the prevailing wage for each job in the locality where the work is to take place. Plaintiffs repeatedly refer to this act as the "Davis Bacon Act," which was actually the federal counterpart, former 40 USC 276a *et seq.*, now 40 USC 3141 *et seq.*, to Michigan's prevailing wage act. Michigan's act refers to the Davis-Bacon Act only to state that any contract that requires that employees be paid in accordance with the federal act is exempt from the Michigan act. See MCL 408.552. Here, however, neither act was relevant to Dunleavy's testimony.

was not properly qualified to testify concerning Laser's compliance with the contractual wage rates.

Accordingly, we hold that the trial court did not abuse its discretion when it admitted Dunleavy's testimony.

### X. UNTIMELY MOTION IN LIMINE

An issue that is not raised before the trial court is not preserved for appeal. *46th Circuit Trial Court v Crawford Co*, 261 Mich App 477, 504; 682 NW2d 519 (2004). Here, plaintiffs did not object to the timing of defendants' motion. Plaintiffs' only procedural objection with respect to the motion was that it was not in writing. Moreover, plaintiffs do not cite Michigan authority to support its contention that this Court must reverse the trial court because the trial court chose to hear a motion in limine at a time other than that specified in its pretrial scheduling order. A party may not simply announce its position and "leave it to this Court to discover and rationalize the basis for the party's claim." *Conlin, supra* at 384. Accordingly, we decline to address this issue.

### XI. BAS'S CLOSING ARGUMENT

Plaintiffs allege that BAS improperly stated during closing arguments that plaintiffs were barred from recovering because they did not submit their disputes to the architect as provided in the contracts. Plaintiffs state that this provision had specifically been removed from the contracts between BAS and Laser, and that the trial court erred when it permitted BAS to raise the issue despite the fact that BAS had not raised it as an affirmative defense.

We hold that in a civil case in which a party assigns as error on appeal remarks of counsel during closing

arguments, but fails to object to those remarks at trial, the party must prove that (1) the remarks were so prejudicial as to have denied the party a fair trial and that (2) any resulting prejudice could not have been cured by a curative instruction. *Thorin v Bloomfield Hills Bd of Ed*, 203 Mich App 692, 704; 513 NW2d 230 (1994); *Bourke v North River Ins Co*, 117 Mich App 461, 466; 324 NW2d 52 (1982). This basis for appeal should be used sparingly for the reasons stated by our Supreme Court in *Hunt v Deming*, 375 Mich 581, 585; 134 NW2d 662 (1965), a case involving a jury instruction in a civil case:

> This is not to say that this Court may not, in *unusual circumstances, and to prevent manifest injustice,* take note of instructions which err with respect to basic and controlling issues in a case even though objection thereto was not made before the jury retired. It is to say however, that the Court will exercise its discretion in this fashion but *sparingly.* [Emphasis added; citations omitted.]

We conclude that no such "unusual circumstances" exist here, and that plaintiffs have failed to prove that (1) the challenged remarks were so prejudicial as to have denied plaintiffs a fair trial, and that (2) any prejudice could not have been avoided by a curative instruction. *Thorin, supra; Bourke, supra.* Accordingly, we decline to address this issue further.

### XII. CASE-EVALUATION SANCTIONS

Plaintiffs maintain that the trial court erroneously awarded case-evaluation sanctions to BAS under MCR 2.403(O)(8). We review de novo a trial court's decision whether to grant case-evaluation sanctions. *Brown v Gainey Transportation Services, Inc*, 256 Mich App 380, 383; 663 NW2d 519 (2003). MCR 2.403(O)(8) provides that a party that seeks case-evaluation sanctions must

file and serve a "request" within twenty-eight days
after the entry of the judgment or entry of an order that
denies a timely motion for a new trial. The twenty-
eight-day requirement "was added to address stale
motions for costs . . . ." *Mahrle, supra* at 349.

Before trial, the parties submitted this case to case
evaluation pursuant to MCR 2.403. The result was a
recommendation that Auch pay plaintiffs $150,000,
while BAS was to pay nothing. BAS accepted this evalu-
ation award, and plaintiffs accepted the $150,000 evalu-
ation award from Auch,[29] but rejected the evaluation
award of zero from BAS. The case proceeded to trial and
defendants prevailed on all of plaintiffs' claims. The
trial court rejected plaintiffs' postjudgment motion for
JNOV or, in the alternative, a new trial, and BAS filed
a request for case-evaluation sanctions pursuant to
MCR 2.403(O).

Plaintiffs do not argue that BAS was not entitled to
recover case-evaluation sanctions, or that the amount of
sanctions was improper. Rather, plaintiffs argue that
BAS's motion for case-evaluation sanctions was un-
timely. BAS filed a motion for sanctions on April 29,
2003, twenty days after the order that denied plaintiffs'
motion for JNOV or a new trial. However, BAS did not
file an affidavit outlining the specific amount of the costs
until June 6, 2003. The trial court heard BAS's motion
and entered an order that awarded BAS $72,635 on June
27, 2003. Plaintiffs maintain that because the affidavit
that detailed BAS's attorney fees was not submitted with
BAS's motion, the motion was not timely because it did
not state BAS's costs with specificity until the affidavit
was filed.

We note that for ordinary taxation of costs, the court
rules require that a prevailing party submit a bill of

---

[29] Auch rejected the evaluation award.

costs that lists costs with particularity within twenty-eight days of the entry of judgment. See MCR 2.625(F) and (G). However, MCR 2.403, by contrast, does not provide specific requirements for the "request" for sanctions. MCR 2.403(O). While MCR 2.625 deals only with costs, MCR 2.403 allows as sanctions "actual costs," which are defined as "those costs taxable in any civil action," as well as "a reasonable attorney fee . . . ." MCR 2.403(O)(6). If the court rules required a party seeking case-evaluation sanctions to specify the amount of actual costs with particularity, then MCR 2.403 would specifically provide such a requirement as MCR 2.625 does. Furthermore, MCR 2.403(O)(6)(b) provides that the portion of the "actual costs" representing the "reasonable attorney fee" is to be "based on a reasonable hourly or daily rate *as determined by the trial judge* for services necessitated by the rejection of the case evaluation." (Emphasis added.) By contrast, MCR 2.625 appears to require a detailed bill of costs because the court clerk is empowered to tax costs without a finding of reasonableness by the trial court. MCR 2.625(F). Because BAS sought a reasonable attorney fee as its "actual costs," the amount of the "actual costs" was required to be determined by the trial court. Here, BAS timely filed its "request" for case-evaluation sanctions, and then submitted an affidavit outlining what it thought to be the reasonable attorney fee incurred a full three weeks before the trial court's hearing on BAS's request. BAS was by no means guaranteed to recover what it stated was the attorney fee incurred; rather, the trial court was given the responsibility of determining what the proper attorney fee would be.

Furthermore, by affirming the trial court's award of costs here, the court rule's purpose to prevent "stale motions for costs" would not be frustrated. BAS filed a timely request for costs that put plaintiffs on notice of

BAS's intent to recover actual costs. Approximately five weeks later, BAS filed and served its detailed affidavit outlining what it thought to be its actual, reasonable attorney fee. This was filed a full three weeks before the date the trial court held a hearing on BAS's request. Plaintiffs cannot argue that BAS's motion was "stale."

For the foregoing reasons, we conclude that the trial court did not err when it awarded BAS case-evaluation sanctions.

### XIII. AWARD OF COSTS

#### A

Plaintiffs assert that the trial court erred when it awarded costs to Auch because those costs were unsupported and excessive. We review an award costs pursuant to MCR 2.625 for an abuse of discretion. *Citizens Ins Co of America v Juno Lighting, Inc*, 247 Mich App 236, 245; 635 NW2d 379 (2001).

Plaintiffs maintain that the trial court abused its discretion when it awarded costs to Auch, which prevailed on all of plaintiffs' claims, because Auch forced plaintiffs out of business by rejecting case evaluation and proceeding to trial in a case that plaintiffs filed. Plaintiffs maintain that because of the enormous expense and debt that they incurred in preparing their case for trial, the trial court abused its discretion by awarding Auch costs. Plaintiffs attempt to blame defendants for this situation because defendants declined to settle a case in which, ultimately, defendants prevailed completely with respect to every claim.[30] Plaintiffs further assert that the costs taxed by Auch were "excessive."

---

[30] In other words, plaintiffs apparently are of the opinion that this Court should reverse the trial court's award of costs to Auch because

Plaintiffs' argument that the trial court abused its discretion when it awarded costs to Auch because plaintiffs incurred a large expense in prosecuting their own case is wholly without merit. Plaintiffs fail to cite any authority for such a proposition, and the proposition confounds common sense.[31]

Plaintiffs claim that the award of costs was excessive because some of the hours billed by Dunleavy were paid for the work of members of Dunleavy's staff who did not testify at trial. Plaintiffs do not cite any authority to explain why this constitutes an excessive expense, nor do they explain why (or even if) this was not a necessary expense incurred by Auch in the preparation of its defense. A party waives an issue by giving it cursory treatment on appeal. *Blazer Foods, supra* at 252. Moreover, given the length of the trial, the size of the construction project involved, and the several hundred exhibits admitted by plaintiffs, we agree with Auch that it is reasonable to expect a significant expense on the part of its experts who spent time reviewing documents produced in connection with this trial.

Because plaintiffs have failed to cite any authority in support of their contention, and because they have not established that the costs were not reasonably incurred for a case of this magnitude, we hold that the trial court did not abuse its discretion when it awarded Auch costs.

B

Plaintiffs assert that the trial court erroneously failed to apportion costs between Laser and Badiee. We

---

Auch had the temerity to actually defend itself against plaintiffs' claims, as opposed to simply surrendering any meritorious defenses and paying plaintiffs a settlement.

[31] We also note that plaintiffs decline to acknowledge that, in all likelihood, plaintiffs filed the instant action of their own volition.

hold that plaintiffs have waived this issue because they have cited no authority whatsoever in support of their arguments. A party may not state their position and then leave it to this Court to search for authority in support of that position. *Conlin, supra* at 384.

Affirmed.