NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  06a0075n.06
Filed:  January 30, 2006

No. 04-2538

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

L.Y.L.E ENTERPRIZES, INC.; STAN'S ) 
MARKET #3, INC.; METRO FOODS, ) 
INC.; FERNDALE FOODS, INC.; J.R. SED, ) 
INC.; 333-01 CORP.; 333-02 CORP.; ) 
MIKE'S MARKETPLACE, INC.; PALACE ) 
SUPERMARKET, INC.; FOODMAX ) 
SUPERMARKET, INC.; OAKLAND ) 
FOODLAND, INC.; GRAND PRICE ) 
FOOD, ) 
                     ) 
       Plaintiffs-Appellants, ) 
                     ) ON APPEAL FROM THE UNITED 
v. ) STATES DISTRICT COURT FOR THE 
                     ) EASTERN DISTRICT OF MICHIGAN 
THE KROGER COMPANY, INC., an Ohio ) 
corporation, ) 
                     ) 
       Defendant-Appellee. 

Before: Moore, Rogers, and McKeague, Circuit Judges.

**Rogers, Circuit Judge.**  This is a diversity action for tortious interference with business relations.  The plaintiffs are a group of independent grocers (the Grocers).  The defendant is the Kroger Company.  The Grocers accuse Kroger of interfering with their business relationship with Foodland Distributors, their former supplier.  Now disbanded, Foodland was half-owned by Kroger.  The Grocers claim that Kroger made large business demands of Foodland over a short period of time that effectively choked off Foodland's ability to support the Grocers.  Some of the Grocers went out of business; others suffered serious financial hardship as they sought new suppliers.  This action

followed.

The district court granted summary judgment in favor of Kroger. It held that the Rule 56 evidence could permit no rational juror to infer that Kroger had maliciously destroyed the Grocers' relationship with their supplier Foodland Distributors. We agree with the analysis of the district court, and accordingly affirm.

**I.**

In the early eighties, Kroger operated about 70 stores in Michigan, and a warehouse in Livonia to supply these stores. In 1984, Kroger closed some of its Michigan stores and sold 22 of them. As an example, Timothy Schrank, a Kroger employee in 1984, "was offered the opportunity to purchase three (3) stores, and go into business as an independent grocer as part of a new chain of independent grocery stores." Kroger formed Foodland to supply its remaining Michigan stores and these independent grocers. Foodland and the independent grocers, some of whom are plaintiffs here, executed supply agreements that were terminable at will.

Foodland supplied the Grocers and also provided them with complementary resources. Foodland provided a broad range of services related to advertising, retail counseling, business management support, procurement of equipment, retail accounting, retail services, store development, and engineering and financial planning. Foodland also provided cutting-edge computer aided programs, other training, and human resources services. Foodland also restricted members from opening new locations within one mile of an existing store serviced by Foodland.

Around 1993 or 1994, Kroger demanded that Foodland pay it an $8 million annual partner initiative. Foodland was to phase in this partner initiative. The Grocers allege that Foodland's means of paying for this $8 million per year initiative in part entailed eliminating retailer support services and much of the advertising budget. According to Schrank, who owns two of the plaintiff Grocers, "[f]rom that point forward until approximately March 1998, the benefits my business historically experienced through the business relationship with Foodland were methodically eroded by such things as eliminating the availability of [Kroger made products] and [Kroger label products], eliminating the management and marketing services, and otherwise experiencing less favorable treatment as compared to the Kroger stores." In addition to the partner initiative, Kroger also sought from Foodland a 15 percent after-tax return on partner equity.

Around March of 1998, the Grocers were summoned to a meeting at Foodland with Foodland personnel. At the meeting, Foodland told the Grocers that Kroger had decided to disband the Foodland organization. Following the disbanding of Foodland, the Grocers could not purchase merchandise from the Livonia Warehouse. The Grocers received 30 days to agree to use Super-Valu's Indiana warehouse as their new supply source. If they did not agree, the Grocers' debts and obligations to Kroger would be accelerated immediately, and they would lose the right to use the Foodland name. Many did agree. Since then, the Grocers insist, their businesses have suffered. This suit followed in March of 2000.

**II.**

This court reviews a district court's grant of summary judgment de novo. *See Forsythe v. BancBoston Mortg. Corp.*, 135 F.3d 1069, 1073 (6th Cir. 1997). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a material fact is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The Grocers have failed to raise a genuine issue for trial because they have not produced Rule 56 evidence tending to prove, with the required level of specificity, that Kroger ended the Foodland venture because of malice towards the Grocers' participation in it. In Michigan, the elements for tortious interference with business relations are:

> [1] the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; [2] knowledge of the relationship or expectancy on the part of the interferer; [3] an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and [4] resultant damage to the party whose relationship or expectancy has been disrupted.

*Feaheny v. Caldwell*, 437 N.W.2d 358, 362-363 (Mich. Ct. App. 1989) (internal quotation marks omitted). As the district court noted, the first and second elements are clearly met. The parties dispute element three. The Grocers satisfy the third element of tortious interference with business relations—intentional interference—only when they produce sufficient evidence showing Kroger's

"illegal, unethical, or fraudulent conduct in addition to intentional interference." *See Trepel v.*

*Pontiac Osteopathic Hosp.*, 354 N.W.2d 341, 347 (Mich. Ct. App. 1984). More specifically, the

Grocers must present evidence that Kroger either (i) intentionally performed a per se wrongful act

or (ii) intentionally did a lawful act with malice that was unjustified in law to invade the Grocers'

relationship with Foodland. *See CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich.

Ct. App. 2002). The Grocers seek to prove element three of their claim by showing that Kroger

acted with malice and unjustified in law. The Grocers thus have the burden to "demonstrate specific

affirmative acts that corroborate the unlawful purpose of the interference." *Badiee v. Brighton Area*

*Schs.*, 695 N.W.2d 521, 539 (Mich. Ct. App. 2005). The Grocers have failed to do so.

The Grocers say that the following undisputed facts permit a rational juror to find that they

have demonstrated, with specificity, affirmative acts corroborating Kroger's malice: (1) Kroger

suddenly demanded that Foodland pay its $8 million annual partner initiative in addition to its

regular profits. (2) Kroger demanded an annual 15 percent after-tax return on its partner equity.

Appellant's Br. at 24.[1] Kroger's demand of the $8 million partner initiative and a 15 percent return

---

[1] In their brief, the Grocers mention another allegation purportedly relevant to Kroger's supposed malice: "Immediately after the dissolution [of Foodland], Kroger systematically began opening stores within close proximity to those Independent Grocers that survived the dissolution of their relationship with Foodland." Appellant's Br. at 25. At oral argument, however, the Grocers' attorney declined to claim that the record supplies any specific example of Kroger's operating a store within one mile of any of the plaintiffs, in violation of the Foodland one mile no-compete policy. The Grocers' attorney pointed to the deposition of Foodland executive David Barens but he did not assert that this deposition names any specific store that Kroger has operated within one mile of any of the plaintiffs. Tr. of Oral Arg. at 35:14–26 (audio recording). In fact, Mr. Barens' deposition in pertinent part names no such store. *See* JA 1562-63. It follows that this totally unsubstantiated element of the Grocers' argument is ineffective to create a genuine issue of material fact and warrants no further attention.

on equity do not permit a reasonable inference of malice. These financial demands simply do not corroborate malice with the required degree of specificity. *See Badiee*, 695 N.W.2d at 538. As the district court noted: "The plaintiffs have not provided evidence that suggests that these payments were maliciously intended to squeeze Foodland and the plaintiffs." JA 37. These "payments may have had that effect, but that is not sufficient to conclude that Kroger acted tortiously in requesting the payments." JA 37. Kroger's financial demands are just as consistent with a desire to maximize shareholder value as they are with malice. The existence of these demands consequently does not support an inference of malice, as opposed to a legitimate business motive. The Grocers have come forward with no adequate Rule 56 evidence tending to prove Kroger's malice with specificity.

## III.

For the foregoing reasons, the district court's judgment is **AFFIRMED**.

**KAREN NELSON MOORE, Circuit Judge, concurs in the judgment.**