# STATE OF MICHIGAN

# COURT OF APPEALS

HUBBELL FOLEY PROPERTIES, L.L.C.,

      Plaintiff-Appellee/Cross-Appellant,

v

WILLIAMS & WILLIAMS II, L.L.C.,

      Defendant/Third-Party Plaintiff-
      Appellee/Cross-Appellant/Cross-
      Appellee,

and

DAN'S EXCAVATING, INC.,

      Third-Party
      Defendant/Appellant/Cross-
      Appellee.

UNPUBLISHED
October 28, 2014

No. 315759
Wayne Circuit Court
LC No. 12-000798-CK

Before: STEPHENS, P.J., and TALBOT and BECKERING, JJ.

PER CURIAM.

This action involves a lease agreement between plaintiff, Hubbell Foley Properties, LLC (HFP), and defendant/third-party plaintiff, Williams & Williams II, LLC (Williams & Williams), as well as an indemnity agreement between Williams & Williams and third-party defendant, Dan's Excavating, Inc. Dan's Excavating appeals as of right the trial court's opinion and order finding that Dan's Excavating was liable to HFP and Williams & Williams for Williams & Williams' unpaid rent under its lease with HFP, the costs of removing soil from certain real property, the cost of repairing the real property, as well as certain fees, including, but not limited to, Williams & Williams' and HFP's attorney fees. In addition, Williams & Williams cross-appeals as of right the trial court's ruling dismissing its common-law indemnity claim. Finally, HFP cross-appeals by delayed leave granted the trial court's ruling that judgment should enter only against Dan's Excavating, not Williams & Williams. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

-1-

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

HFP owns a 14-acre parcel of property located at 12301 Hubbell Street in Detroit (the property). It uses the property to store trucks in a garage. In approximately March 2011, Terry Williams, of Williams & Williams, approached HFP and inquired about leasing the property to store soil that had been excavated by Dan's Excavating. William Barr, the vice president of the company that oversaw HFP, agreed to allow Williams & Williams to lease the property for the purpose of storing soil. Initially, the parties operated pursuant to an oral contract.

In addition to entering into an oral lease with HFP, Williams & Williams entered into a written agreement with Dan's Excavating regarding the property. Dan's Excavating had inquired about the property because it needed a place to dump soil that it extracted as part of a highway reconstruction project. Terry represented to employees of Dan's Excavating that Williams & Williams owned the property, and agreed to lease the property to Dan's Excavating as a dumpsite. Pursuant to the parties' agreement, trucks owned by Williams & Williams would transport the soil to the property. When the soil was dumped at the property, Dan's Excavating would use a bulldozer to push the soil into a pile. After the soil was dumped onto the property, Williams & Williams agreed that it owned the soil, which it planned to sell. Between March 2011 and September 2011, Dan's Excavating dumped thousands of cubic yards of soil onto the property.

To memorialize their agreement, Dan's Excavating prepared, and both Dan's Excavating and Williams & Williams signed, a document entitled "Property Use Agreement." The document, which was approximately two pages in length, required Dan's Excavating to indemnify Williams & Williams as follows:

> Know all men by these presents [sic] that in consideration of the use of certain property defined as __**12301 Hubbell St. Detroit, MI 48227**__, DAN'S Excavating, Inc. does hereby agree to save and hold harmless __**"Williams & Williams II, LLC**__ **"** the owner of record of said property from any and all claims arising out of our operations on said property. Such operations to include:
>
> _____ Field Office
>
> __X__ Temporary Construction Yard
>
> __X__ Dump Site for Earth Fill
>
> _____ Temporary Site for Concrete Recycling Operation
>
> _____ Other:_____

In approximately June or July of 2011, the parties began to suspect that the soil was contaminated. Around this time, Williams & Williams stopped paying rent to HFP. Concerns about the soil prompted Williams & Williams to have the soil tested for contaminants and/or hazardous materials in September of 2011. The first test results showed that the soil was not contaminated; a second set of results showed various levels of contamination. Terry testified

that he had the second set of tests conducted because he had concerns about the soil after seeing Dan's Excavating's employees dump "raw water and black water" onto the soil pile.

In November of 2011, HFP and Williams & Williams entered into a written agreement (Lease Agreement) for the property. By its terms, the Lease Agreement had already expired at the time Williams & Williams signed the document; thus, pursuant to the document, Williams & Williams was a holdover tenant. The written Lease Agreement required, among other matters, Williams & Williams to control the soil pile and prevent it from spreading. It also imposed duties on Williams & Williams to keep the property free from soil that was contaminated.

On January 18, 2012, HFP filed a complaint against Williams & Williams alleging that the soil was contaminated and seeking its removal. The complaint also alleged that Williams & Williams failed and refused to take necessary steps to prevent the soil from dispersing by wind and precipitation.

On February 10, 2012, Williams & Williams filed a third-party complaint against Dan's Excavating. Williams & Williams alleged that it tendered its defense in HFP's cause of action to counsel for Dan's Excavating, citing the indemnity provision in the Property Use Agreement, but Dan's Excavating refused to assume the defense. Williams & Williams alleged both a common-law indemnity claim and a claim for indemnity under the terms of the Property Use Agreement.

On February 22, 2012, the trial court entered an order requiring Dan's Excavating to "promptly hire, at its expense, a qualified consultant or qualified consultants for the purpose of preparing a plan to address odors, erosion, dust, and contamination, if any, of the dirt pile." The order also required Dan's Excavating to: 1) "[p]ropose a scope of work for testing the soil pile for 'hazardous substances,' as that phrase is defined in Part 201 of the Natural Resources and Environmental Protection Act, MCL 324.20101 *et seq*."; 2) "[p]ropose a method for prompt removal and disposal of those portions of the dirt pile that contain hazardous substances consistent with the statutes and regulations applicable to such hazardous substances"; 3) "[p]ropose a method for covering, retaining, fencing, or otherwise preventing migration, blowing or spreading of the potentially contaminated soil prior to its removal," with Williams & Williams to be responsible for similar conduct associated with the "remaining soils"; 4) circulate the plan within 10 days of the order to HFP and Williams & Williams for their approval; 5) begin implementing the plan within 30 days of the order; and 6) complete the removal process "of those portions of the dirt pile that contain hazardous substances consistent with the applicable statutes and regulations including those applicable to such hazardous substances" within 120 days of the order. The order also provided that the "[r]emoval of the remaining uncontaminated portion of the dirt pile, if any, shall be the responsibility of Williams & Williams II LLC."

In the following months, Dan's Excavating had the soil tested by AMEC Environmental Infrastructure; this testing revealed that the soil did not contain hazardous materials in excess of state-mandated limits for industrial properties such as the property at issue. Because the soil was not contaminated under applicable regulations, Dan's Excavating argued that it had no obligation to remove the soil. HFP and Williams & Williams continued to assert that Dan's Excavating was liable for the cost of removing the soil.

On July 18, 2012, the trial court ordered that Dan's Excavating was to immediately

[r]emove all soil placed on the property at 12301 Hubbell St, Detroit, Michigan by either Dan's Excavating or Williams & Williams II LLC, or their agents, employees, or contractors, working diligently and continuing until completed without interruption, in compliance with all applicable laws and without damage or injury to the plaintiff's property.

Regarding the cost of removing the soil, the order provided that "[a]llocation of costs for such removal will be subject to further order of the Court."

Pursuant to the July 18, 2012 order, Dan's Excavating and Williams & Williams entered into an agreement entitled "Agreement to Remove Dirt" whereby Dan's Excavating agreed that it would abide by the trial court's July 18, 2012 order by excavating and loading the soil onto trucks supplied by Williams & Williams. The agreement expressly referenced the trial court's July 18, 2012 order indicating that the cost of removing the soil would be allocated by the trial court at a later date. The agreement also stated that Dan's Excavating agreed to pay Williams & Williams $2.75 per truck yard of dirt, and to give Williams & Williams a $10,000 down payment. The soil was removed from HFP's property in approximately August or September of 2012.

Thereafter, Williams & Williams filed a motion to enforce payment under the Agreement to Remove Dirt, alleging that Dan's Excavating failed to pay for the removal of the soil. Dan's Excavating opposed the motion. In October 2012, the trial court ordered Dan's Excavating to place $139,754 into an escrow account for the cost of removing the soil. Subsequently, the trial court ordered Dan's Excavating to release $40,000 from the escrow account to Williams & Williams so that the latter could use the money to pay subcontractors who participated in removing some of the soil.

In November 2012, the case proceeded to a bench trial. HFP sought unpaid rent under the Lease Agreement, damages for the cost of repairing the stone surface of its property, which it alleged was damaged by Dan's Excavating during the removal of the soil, and its attorney fees expended in this action. In addition, HFP alleged that, when the soil was stored on the property, it was not properly contained, making it necessary for HFP to purchase a sweeper machine and to employ an individual to run the machine in order to keep dust from accumulating throughout the property. HFP stored trucks on the property and alleged that, when it rained, the property became muddy and nearly unusable for its trucking operations.

Citing the indemnity provision in the Property Use Agreement, Williams & Williams sought to be indemnified for any and all claims raised against it by HFP, including HFP's claims for unpaid rent under the Lease Agreement. Williams & Williams also sought to hold Dan's Excavating responsible for the cost of removing the soil, which Williams & Williams alleged was contaminated.

Dan's Excavating, meanwhile, argued that the soil was not contaminated, based on the testing performed by AMEC; thus, it argued that it was not required to bear the cost of removing the soil. Further, Dan's Excavating claimed that it was not required to indemnify Williams & Williams for any of HFP's claims against Williams & Williams, arguing that the claims were based solely on HFP's Lease Agreement with Williams & Williams—an agreement to which

Dan's Excavating was not a party—and that none of the claims fell within the scope of the indemnity provision of the Property Use Agreement.

Following a bench trial, the trial court found, based on testimony and test results, that the soil was not contaminated, as none of the levels of certain materials present in the soil exceeded state-mandated levels for such materials on industrial properties such as HFP's. Next, the trial court found that, under the terms of the Property Use Agreement, Dan's Excavating was required to indemnify Williams & Williams, and it concluded that Dan's Excavating was liable to both Williams & Williams and HFP for all of their respective claims and expenditures in this case, "excluding attorney fees." The trial court did not enumerate the claims or explain Dan's Excavating's liability with regard to any particular claim, but simply noted that the Property Use Agreement related to "any and all claims[.]" In addition, the trial court found that Dan's Excavating was required to repair the damage done to HFP's property when it removed the soil from the property. Lastly, the trial court ordered HFP and Williams & Williams to submit bills for their respective costs and attorney fees.

On March 26, 2013, the trial court entered an order clarifying the obligations of the parties. First, the trial court found that Dan's Excavating was required to repair the damage done to the property during removal of the soil in accordance with an estimate that had been provided at trial, or, in the alternative, was to pay HFP $76,080, representing the total amount set forth in the estimate. Second, concerning the cost of removing the soil, the trial court ruled that Dan's Excavating was required to pay the remaining $99,754 that was held in escrow to Williams & Williams in order to compensate Williams & Williams for the cost of transporting the soil off the property. In doing so, the trial court did not specify whether Dan's Excavating's liability in this instance was predicated on the Property Use Agreement or whether such liability arose from another source, such as the Agreement to Remove Dirt. Third, the trial court set forth a list of amounts that Dan's Excavating "must pay to [HFP] . . . that Williams owes [HFP] . . . . These amounts were as follows: "unpaid rent ($51,360.00), mud and dust clean up ($18,100), and interest ($1,582.50), for a total of $71,042.50." In reaching this holding, the trial court failed to specify whether Williams & Williams breached its Lease Agreement with HFP in respect to the matters noted above. The trial court also failed to consider whether, under the plain language of the indemnity agreement between Dan's Excavating and Williams & Williams, Dan's Excavating was required to indemnify Williams & Williams for claims against it with regard to unpaid rent and cleaning the property. Fourth, the trial court found that Dan's Excavating was liable to Williams & Williams for "the following expenditures [sic] arising from the indemnity agreement . . . $3,350, representing the cost of Midwest Analytical invoices[.]" Fifth, the trial court ordered Dan's Excavating to pay Williams & Williams' attorney fees and costs in the amount of $76,570.58. The trial court did not identify the basis for imposing this liability on Dan's Excavating. Sixth, the trial court ordered Dan's Excavating to pay HFP's attorney fees and costs, also without providing an explanation for the basis of its ruling. Finally, the trial court ordered Dan's Excavating to pay Williams & Williams' "costs in the amount of $2,033.00."[1]

---

[1] We presume that the "costs" referred to are court costs.

Throughout the trial court proceedings, HFP sought to hold both Williams & Williams and Dan's Excavating liable for any amounts awarded to it. On April 23, 2012, the trial court entered an order denying HFP's request to do so and clarified that only Dan's Excavating was liable. That same day, the trial court entered a written order dismissing Williams & Williams' common law indemnity claim; the trial court had earlier granted Dan's Excavating a directed verdict on this claim. This appeal followed.

## II. DAN'S EXCAVATING'S ISSUES ON APPEAL

Dan's Excavating raises several issues on appeal, which can essentially be consolidated into three arguments. First, it contends that it cannot be held directly liable to HFP because it was not a party to the Lease Agreement between HFP and Williams & Williams, out of which such claims arise. Second, it argues that to the extent Williams & Williams is liable to HFP, it is not obligated to save and hold harmless Williams & Williams because none of those claims fall within the ambit of either the Property Use Agreement or the Agreement to Remove Dirt. And third, it contends that there was no legal basis upon which the trial court could hold it accountable for the attorney fees and costs of the other parties. Most of Dan's Excavating's arguments have merit.

## A. DIRECT LIABILITY TO HFP

Dan's Excavating first argues that the trial court erred when it ruled that Dan's Excavating was directly liable to HFP for all of HFP's claims. "This Court reviews a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Id.*

We hold that the trial court erred when it found Dan's Excavating directly liable to HFP for HFP's claims against Williams & Williams. Before liability can be imposed, there must be a theory on which to impose liability. See, generally, *Jimkoski v Shupe*, 282 Mich App 1, 10-11; 763 NW2d 1 (2008) (explaining that the imposition of liability on the defendant under a certain theory was a sufficient ground to support the verdict against the defendant). The only theories of liability asserted by HFP were against Williams & Williams, not against Dan's Excavating. And, as noted, there were no contractual agreements between HFP and Dan's Excavating, namely because HFP refused to enter into one when Dan's Excavating learned that HFP was the true property owner and sought to enter into a property use agreement with HFP. Thus, there was nothing to support the trial court's decision to find Dan's Excavating directly liable to HFP for all of its claims against Williams & Williams.

The trial court appeared to support, at least in part, its imposition of liability against Dan's Excavating based on the indemnification provision contained in the Property Use Agreement between Williams & Williams and Dan's Excavating. As noted, the trial court stated that "Dan's must pay all amounts that Williams & Williams owes to [HFP] for": (1) unpaid rent; (2) mud and dust clean up; and (3) interest. "An indemnity contract creates a direct, primary liability between the indemnitor and the indemnitee that is original and independent of any other obligation." *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 173; 848 NW2d 95 (2014).

Here, the trial court erred by imposing direct liability on Dan's Excavating for HFP's claims against Williams & Williams. The indemnity agreement in this case operated to create direct liability between Dan's Excavating, the indemnitor, and Williams & Williams, the indemnitee. *Miller-Davis Co*, 495 Mich at 173. Such an agreement did not create direct liability between Dan's Excavating and HFP. See *id.* Rather, the agreement required Dan's Excavating to assume certain liability incurred by Williams & Williams. See *Travelers Prop Cas Co of America v Peaker Servs, Inc*, __ Mich App __; __ NW2d __ (2014) (Docket No. 315070, issued July 22, 2014), slip op at 7 (explaining an indemnity agreement as an assumption of liability). In assessing Dan's Excavating's obligations under the indemnity agreement, the trial court should have first determined whether Williams & Williams was liable to HFP for any of HFP's claims, and thereafter determined whether the indemnity agreement applied to any of those claims, implicating Dan's Excavating's duty to "save and hold harmless" Williams & Williams. See *Miller-Davis Co*, 495 Mich at 176-177 (explaining that a court must consider the language of the indemnification agreement and ascertain whether the agreement applies to the facts of the case). See also *Cliffs Forest Prods Co v Al Disdero Lumber Co*, 144 Mich App 215, 225; 375 NW2d 397 (1985) (explaining that there must be primary liability before there can be a claim for indemnification). Thus, with one exception, discussed below, we reverse the trial court's order to the extent it holds Dan's Excavating directly liable to HFP. We remand to the trial court for a determination of whether HFP has proven its claims against Williams & Williams, which is salient to HFP's claim of appeal, discussed in Section III. While the appropriate next step would typically be for the trial court to determine whether the indemnity agreement applies to any of those claims, implicating Dan's Excavating's duty to "save and hold harmless" Williams & Williams, we conclude as a matter of law, as addressed in Section II B, that but for the damage to the stone surface of HFP's property, none of HFP's claims against Williams & Williams falls within the ambit of the indemnity agreement.

Although we reverse the trial court's imposition of direct liability on Dan's Excavating for all of HFP's other claims, we find that the trial court did not err in holding Dan's Excavating directly liable to HFP for damage done to the stone surface of the property. In its July 18, 2012 order, the trial court required Dan's Excavating to remove the soil from HFP's property, "without damage or injury to [HFP's] property." A court has discretion to impose various sanctions upon a party that violates a court order. See *Vicencio v Ramirez*, 211 Mich App 501, 506-507; 536 NW2d 280 (1995). Here, it is undisputed that Dan's Excavating damaged the property when it removed the soil, thereby violating the trial court's order to remove the soil without damaging the property. Based on this undisputed violation of the trial court's July 18, 2012 order, we affirm the trial court's decision to impose liability on Dan's Excavating for damaging the property, albeit under alternative reasoning.[2] See *Lavey v Mills*, 248 Mich App 244, 250; 639 NW2d 261 (2001) (citation and quotation omitted) ("[w]hen this Court concludes

---

[2] Although Dan's Excavating's damage to the stone surface of the subject property falls within the ambit of its indemnity clause with Williams & Williams—wherein it agreed to hold Williams & Williams harmless for "our operations on said property,"—we need not address the issue because we affirm the trial court's imposition of direct liability on Dan's Excavating based on its violation of the court's order not to damage the property.

that a trial court has reached the correct result, this Court will affirm even if it does so under alternative reasoning."). In all other respects, we reverse the trial court's decision to the extent it held Dan's Excavating directly liable to HFP.

In reaching this conclusion, we reject two alternate grounds for affirmance raised by HFP. HFP first argues that the trial court's entire damage award against Dan's Excavating in favor of HFP should be upheld because Dan's Excavating failed to comply with several of the trial court's orders in this case. HFP contends that Dan's Excavating did not comply with some of the deadlines that the trial court set for testing, containing, and/or removing the soil. HFP argues that Dan's Excavating's failure to comply with the trial court's orders deprived it of the use of its property and contributed to its damages. HFP raises such an argument for the first time on appeal.

The failure to comply with a court order empowers the trial court, on the motion of a party or *sua sponte*, to enter a default against the non-complying party. MCR 2.504(B)(1). This Court has explained that a default under MCR 2.504(B)(1) is a drastic sanction and requires the trial court to consider several factors, including whether the failure to comply was willful or accidental, whether there was prejudice to the opposing party, whether there was a history of a failing to comply with court orders, whether there were attempts to cure the defect, and whether a lesser sanction would be more appropriate. See *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 631; 750 NW2d 228 (2008); *Vicencio*, 211 Mich App at 506-507.

Contrary to HFP's contentions, a default judgment would not have been appropriate in this case. Aside from delays in testing the soil, it is not apparent that Dan's Excavating violated the trial court's orders in the manner suggested by HFP because Dan's Excavating was not required to remove uncontaminated soil under the trial court's initial orders, and the trial court ultimately determined that the soil was not contaminated. Indeed, the trial court's February 22, 2012 order, which HFP contended that Dan's Excavating violated, only required Dan's Excavating to remove contaminated portions of the soil, and charged Williams & Williams with removing any uncontaminated soil. The trial court found that the soil was not contaminated; that finding is not challenged on appeal. Where none of the soil was contaminated, Dan's Excavating did not violate the court's order by failing to remove soil that it had no responsibility to remove. Further, although the record reveals that Dan's Excavating was required to have the soil tested and to develop a plan for the soil in March 2012, and that it did not complete such testing until April 2012, it ultimately complied with the trial court's orders by having the soil tested. Consequently, Dan's Excavating cured its violation with respect to testing, which is a factor that weighs against granting a default. See *Woods*, 277 Mich App at 631. In addition, when the trial court ordered Dan's Excavating to remove the soil—contaminated or otherwise—with costs to be allocated at a subsequent date, in the July 18, 2012 order, Dan's Excavating complied with the trial court's order. Lastly, although Dan's Excavating damaged the property when it removed the soil, thereby violating the trial court's July 18, 2012 order to the extent that it required Dan's Excavating to remove the soil "without damage or injury to [HFP's] property," HFP could be made whole by simply bringing a claim against Dan's Excavating for the damage. Thus, the sanction of entering a default against Dan's Excavating with respect to all claims for failing to comply with court orders was not warranted. See *Woods*, 277 Mich App at 631; *Vicencio*, 211 Mich App at 506-507.

-8-

In addition, we reject HFP's argument that it was an intended third-party beneficiary of the Property Use Agreement between Williams & Williams and Dan's Excavating. "A person is a third-party beneficiary of a contract only when that contract establishes that a promisor has undertaken a promise directly to or for that person." *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 428; 670 NW2d 651 (2003). "An objective standard is to be used to determine, from the form and meaning of the contract itself, whether the promisor undertook to give or to do or to refrain from doing something directly to or for the person claiming third-party beneficiary status[.]" *Id.* (internal citation omitted). Here, there can be no dispute that the Property Use Agreement does not designate HFP as an intended third-party beneficiary. None of the promises therein expressed an intent to directly benefit HFP, much less contained any mention of HFP. See *id.* (holding that where there is no promise to directly benefit another party, that party is not an intended third-party beneficiary). Indeed, the record reveals that Dan's Excavating did not even know of HFP's existence at the time it signed the Property Use Agreement, as Williams & Williams expressly held itself out to be "the owner of record of said property." HFP's argument that Dan's Excavating's subsequent discovery of HFP as the actual owner somehow acts to post-hoc coronate HFP as a third-party beneficiary plainly lacks merit.

## B. INDEMNIFICATION OBLIGATIONS
## AND OTHER LIABILITY TO WILLIAMS & WILLIAMS

Next, we consider Dan's Excavating's argument that, regardless of the legitimacy of HFP's claims against Williams & Williams, based upon the trial court's factual findings it is not liable under the Property Use Agreement to indemnify and hold harmless Williams & Williams for any of HFP's claims, or for that matter, any of Williams & Williams' own claims against Dan's Excavating.

Resolution of whether any potential claims by HFP against Williams & Williams fall within the scope of the indemnity agreement contained in the Property Use Agreement requires this Court to examine the indemnity provision. "An indemnity contract creates a direct, primary liability between the indemnitor and the indemnitee that is original and independent of any other obligation." *Miller-Davis Co*, 495 Mich at 173. "An indemnity contract is to be construed in the same fashion as other contracts." *Zahn v Kroger Co of Mich*, 483 Mich 34, 40; 764 NW2d 207 (2009). Thus, this Court must examine the plain language of the agreement, and "[t]he extent of the duty [to indemnify] must be determined from the language of the contract, itself." *Id.* "[I]f the language of the contract is clear and unambiguous, it is to be construed according to its plain sense and meaning." *Id.* at 41.

In examining the indemnitor's duty to indemnify, a reviewing court must consider the language of the indemnification agreement and ascertain whether the agreement applies to the facts of the case. See *Miller-Davis Co*, 495 Mich at 174. In addition, a reviewing court must look at the claims made against the indemnitee in order to determine if they fall within the scope of the indemnification agreement. *Id.* at 176-177. See also *Ajax Paving Indus, Inc v Vanopdenbosch Const Co*, 289 Mich App 639, 646-647; 797 NW2d 704 (2010). "[I]ndemnity contracts are construed strictly against the party who drafts them and against the indemnitee . . . ." *Badiee v Brighton Area Sch*, 265 Mich App 343, 352; 695 NW2d 521 (2005) (citation and quotation omitted).

The indemnification provision at issue in this case provides as follows:

Know all men by these presents [sic] that in consideration of the use of certain property defined as ____**12301 Hubbell St. Detroit, MI 48227**____, DAN'S Excavating, Inc. does hereby agree to save and hold harmless __**"Williams & Williams II, LLC**____ **"** the owner of record of said property from any and all claims arising out of our operations on said property. Such operations to include:

_____ Field Office

__X__ Temporary Construction Yard

__X__ Dump Site for Earth Fill

_____ Temporary Site for Concrete Recycling Operation

_____ Other:_____

As noted, the provision provides indemnification for "any and all claims" arising out of "our" operations on the property. A reasonable interpretation of the word "our" in the agreement means Dan's Excavating.[3] Dan's Excavating's operations included using the site as a temporary construction yard and a dumpsite for earth fill. In construing indemnity provisions, our Supreme Court has explained that the terms "any" and "all" "provide for the broadest possible obligation to indemnify." *Miller-Davis Co*, 495 Mich at 175. In this case, the duty to indemnify applies to any and all claims "arising" out of Dan's Excavating's operations on the property. The word "arising" is not defined in the contract, so this Court may consult a dictionary in order to ascertain the plain meaning of the term. *Holland v Trinity Health Care Corp*, 287 Mich App 524, 527-528; 791 NW2d 724 (2010). The term "arise" has been defined to mean "to appear; spring up . . . to result; spring or issue[.]" *Random House Webster's College Dictionary* (2005).

1. HFP's Claim for Unpaid Rent

HFP raised a claim against Williams & Williams for unpaid rent. Although the undisputed evidence produced at trial revealed that Williams & Williams admittedly failed to pay rent to HFP, the trial court failed to make the requisite finding that Williams & Williams was liable on this claim. Instead, the trial court simply held that Dan's Excavating was directly liable to HFP on HFP's claims for unpaid rent.

Even if Williams & Williams is found to be liable to HFP for unpaid rent, Dan's Excavating correctly asserts that the indemnity agreement cannot be used to compel Dan's

---

[3] In its January 28, 2013 Opinion and Order, the trial court found that the word "our" referred only to Dan's Excavating, and none of the parties dispute this on appeal; indeed, throughout its briefing, even Williams & Williams submits that the indemnification provision should read in such a manner that it provides indemnity for "[Dan's] operations on the property."

Excavating to indemnify Williams & Williams for Williams & Williams' nonpayment of rent to HFP. Such unpaid rents cannot be said to "spring up" or "result" from Dan's Excavating's operations on the property. Dan's Excavating operations consisted of bringing soil onto the property and spreading the soil with a bulldozer. The soil then became the property of Williams & Williams. Williams & Williams' obligation to pay rent was wholly unrelated to those operations. Indeed, Williams & Williams' rent obligation arose out of a contract to which Dan's Excavating was not a party. Further, Williams & Williams' obligation to pay rent under the Lease Agreement with HFP was not conditioned in any way upon anything that Dan's Excavating did or did not do. Finally, the "any and all claims" provision of the indemnity agreement cannot conceivably be interpreted to include Williams & Williams' rent obligations to the property owner, HFP, because Dan's Excavating understood, when executing the Property Use Agreement, that Williams & Williams *was* the property owner, as was explicitly stated in the Property Use Agreement signed by Williams & Williams. As such, the trial court erred when it required Dan's Excavating to bear responsibility for unpaid rent under a contract between Williams & Williams and HFP.

2. HFP's Claim for Costs Associated with Maintenance of the Soil Pile

The trial court found that Dan's Excavating was directly liable to HFP for costs associated with maintaining the soil pile, without first assessing whether Williams & Williams' breached its Lease Agreement in this regard. Nonetheless, regardless of Williams & Williams' obligations to HFP, we agree with Dan's Excavating that such a claim would not fall within the scope of the indemnity provision contained in the Property Use Agreement. Dan's Excavating's operations on the property merely pertained to dumping soil and pushing the soil into a pile. At trial, Terry Williams admitted that Williams & Williams owned the soil after it was dumped onto the property. It was solely the responsibility of Williams & Williams to maintain the pile of soil, and any claim that the soil, after piled, spread and caused dust to accumulate on the property, did not arise out of Dan's Excavating's operations on the property. In short, the dust and mud that accumulated on the property was attributable to Williams & Williams' negligence, not Dan's Excavating's operations on the property.

This conclusion does not end our analysis, as an indemnitor can sometimes be liable for the negligence of the indemnitee. See *Badiee*, 265 Mich App at 352. Here, the indemnity provision in the Property Use Agreement did not expressly state whether Dan's Excavating was to indemnify Williams & Williams for claims arising out of the acts of Williams & Williams. "Indemnity clauses need not expressly mention the indemnitee's own acts to provide coverage for them." *Id.* at 353. "However, this certainly does not mean the court will automatically assume the clause covers the indemnitee's acts[.]" *Id.* Instead, in order for the clause to provide indemnification for the acts of the indemnitee, the plain language of the contract must demonstrate an intent to cover the acts of the indemnitee. *Id.* This Court has found an intent for the indemnitor to indemnify the indemnitee for acts of the indemnitee where the indemnification provision expressly excludes claims arising from the indemnitee's *sole* negligence. *Id.*, citing *Paquin v Harnischfeger Corp*, 113 Mich App 43, 52-53; 317 NW2d 279 (1982). Such a provision signifies an intent to indemnify in all circumstances involving the indemnitee's own negligence, save for those situations where the indemnitee is solely negligent. *Id.* In addition, this Court has found an intent to indemnify for actions taken by the indemnitee where the indemnity provision purports to provide indemnification for the work covered by the contract,

and where it was anticipated that employees of both the indemnitor and the indemnitee would be working together in order to accomplish the work covered by the contract. *Id.*, citing *Fishbach-Natkin Co v Power Process Piping, Inc*, 157 Mich App 448, 452; 403 NW2d 569 (1987). In such an instance, the plain language of the contract acknowledges the possibility that a claim could result from work that the indemnitee's employees had done, thereby establishing an intent to indemnify for the acts of the indemnitee and its employees. *Id.*

Here, the plain language of the indemnity provision does not demonstrate an intent for Dan's Excavating to indemnify Williams & Williams for its own negligence. The agreement only purports to indemnify for claims arising out of Dan's Excavating's operations on the property. It does not mention claims arising out of Williams & Williams' actions, nor does it mention the possibility of Williams & Williams participating in the operations of Dan's Excavating. Therefore, any claim against Williams & Williams for maintaining the soil pile would not fall within the ambit of the indemnity provision. See *id.* at 353-354.

3. Williams & Williams' Claim for Costs Associated with Removing the Soil

Dan's Excavating argues that it was not legally obligated by either the Property Use Agreement or the Agreement to Remove Dirt to reimburse Williams & Williams for its costs associated with removing the soil from HFP's property; thus, the trial court erred in imposing this cost upon Dan's Excavating. It is unclear from the record why the trial court imposed this cost upon Dan's Excavating.

We agree with Dan's Excavating that the indemnity provision contained in the Property Use Agreement could not be used to support the trial court's decision to require Dan's Excavating to pay Williams & Williams for the cost of removing the soil. In order to evaluate this issue, we look to the claims brought against Williams & Williams. HFP alleged that Williams & Williams was required, under the Lease Agreement, to remove the soil from the property. The Lease Agreement between Williams & Williams and HFP required Williams & Williams to keep the premises free of "Hazardous Materials," which were defined to include materials that were hazardous under pertinent standards and regulations. As Dan's Excavating notes, the trial court found that, under pertinent regulations the soil was not considered to be contaminated because the levels of contaminants present in the soil did not, pursuant to two of the three tests conducted on the soil, exceed regulations for industrial property. That finding of fact is unchallenged on appeal. Accordingly, any claim by HFP against Williams & Williams related to removing soil that contained "hazardous materials" would fail. Because the soil was not contaminated, any claim by Williams & Williams for indemnification in this regard must also fail. See *Miller-Davis Co*, 495 Mich at 173, 176-177. Thus, the indemnification agreement cannot be used to require Dan's Excavating to pay for the removal of soil that was not contaminated.

We also agree that the Agreement to Remove Dirt does not provide a viable legal basis upon which the trial court could hold Dan's Excavating accountable for Williams & Williams'

-12-

expenses associated with the soil removal.[4]  Because this issue requires interpretation of a contract, our review is de novo. *Miller-Davis Co*, 495 Mich at 172.  The recitals section of the agreement provides, in pertinent part:

> D.     In the [underlying action,] the [C]ourt entered an order dated July 18, 2012, requiring Dan's to remove the dirt pile by August 27, 2012.  The Order also provided that *the determination of responsibility for costs of removal would be decided by this Court at a later date.*
>
> E.     Dan's has agreed to enter into this Agreement with Williams to abide by this Court's Order of July 18, 2012, regarding the transporting of dirt from the Property.  Dan's has agreed that it will place the dirt located on the Property onto trucks to be supplied by Williams.  [Emphasis added.]

The Agreement to Remove Dirt expressly references the trial court's July 18, 2012 order, which provided that Dan's Excavating was to remove the soil, and that the "[a]llocation of costs for such removal will be subject to further order of the Court."  The July 18, 2012 order stated that it was enforcing the trial court's February 22, 2012 order, which provided that if the soil was contaminated, Dan's Excavating was to be responsible for removing the soil, and that if it was not contaminated, Williams & Williams was to be responsible for removing the soil.

Although somewhat inartfully drafted, we find that the Agreement to Remove Dirt unambiguously provides that Dan's Excavating only agreed to be liable for the cost of removing the soil if, consistent with the trial court's order referenced in the Agreement to Remove Dirt, the soil was contaminated.  See *Island Lake Arbors Condo Ass'n v Meisner & Assoc, PC*, 301 Mich App 384, 393; 837 NW2d 439 (2013) (citation and quotation omitted) (explaining that "[a] contract is clear and unambiguous if, however inartfully worded or clumsily arranged, it fairly admits of but one interpretation.").  The recitals in the Agreement to Remove Dirt unambiguously refer to the trial court's order indicating that the cost of removing the soil will be allocated later; that order in turn refers to another order indicating that Dan's Excavating will be responsible for the costs only if the soil is contaminated.  Thus, the Agreement to Remove Dirt indicates that Dan's Excavating agreed to be liable for the cost of removing the soil, if the soil was contaminated.  Subsequent portions of the Agreement to Remove Dirt pertaining to the costs that Dan's Excavating would pay referred to amounts that Dan's Excavating agreed to pay in the event that it was required to pay for the cost of removing the soil.  As such, the Agreement to Remove Dirt could not have supported the trial court's decision to impose the costs of removing the soil on Dan's Excavating.

---

[4] In deciding this issue, we reject Williams & Williams' cursory claim that we should not consider this issue because Dan's Excavating failed to include it in its statement of questions presented.  When a party fails to raise an issue in its statement of questions presented, this Court need not address the issue.  See, e.g., *Caldwell v Chapman*, 240 Mich App 124, 132; 610 NW2d 264 (2000).  However, contrary to Williams & Williams' contentions, Dan's Excavating expressly raised an issue relating to the Agreement to Remove Dirt in its statement of questions presented as Issue IV.

Therefore, as Dan's Excavating argues, the trial court erred by ordering Dan's Excavating to pay the amount set aside in escrow to Williams & Williams, as there is no basis in the record to support such a ruling. On remand, the trial court should enter an order holding that Dan's Excavating is entitled to the amount placed into escrow—here, $139,754—this includes the $40,000 that Dan's Excavating was initially required to pay to Williams & Williams for the purpose of paying subcontractors who participated in the removal of the soil.[5]

4. Williams & Williams' Claim for Costs Associated with Testing the Soil

Further, we agree with Dan's Excavating that the indemnity agreement cannot be used to justify the trial court's decision to require Dan's Excavating to reimburse Williams & Williams for the costs it incurred in testing the soil. The trial court found that the soil was not contaminated for industrial purposes. As noted, Williams & Williams is not accountable to HFP with regard to the soil if the soil is not contaminated. Therefore, Dan's Excavating cannot be liable to Williams & Williams under the indemnity agreement because HFP could not assert a viable claim against Williams & Williams for testing soil that was not contaminated. Williams & Williams' decision, on its own, to order testing does not amount to a claim against Williams & Williams. Dan's Excavating has no duty to indemnify Williams & Williams with respect to the costs of testing the soil.

C. ATTORNEY FEES AND COSTS

Dan's Excavating argues that the trial court erred when it ordered Dan's Excavating to pay HFP's and Williams & Williams' attorney fees and costs. We agree.

"We review a trial court's decision whether to award attorney fees for an abuse of discretion, the trial court's findings of fact for clear error, and any questions of law de novo." *Loutts v Loutts*, 298 Mich App 21, 24; 826 NW2d 152 (2012). Michigan follows the 'American rule' with respect to the payment of attorney fees and costs." *Haliw v Sterling Hts*, 471 Mich 700, 706; 691 NW2d 753 (2005). "Under the American rule, attorney fees generally are not recoverable from the losing party as costs in the absence of an exception set forth in a statute or court rule expressly authorizing such an award." *Id.* at 707. This Court has recognized that, generally, in *common-law* indemnity claims, the indemnitee may recover its attorney fees from the indemnitor. *Hayes v General Motors Corp*, 106 Mich App 188, 200; 308 NW2d 452 (1981). However, contrary to the representations of Williams & Williams on appeal, that general rule does not apply in actions based on contractual indemnity. See *id.* at 201. See also *Redfern v RE Dailey & Co*, 146 Mich App 8, 19; 379 NW2d 451 (1985). Where an indemnitee relies on

---

[5] In reaching this decision, we reject Dan's Excavating's argument that it is entitled to judgment in its favor in the amount of $246,530, which allegedly represents Dan's Excavating's attorney fees and other costs expended in this action. Dan's Excavating has not argued any theory that would support the imposition of such liability; therefore, it failed to adequately brief this matter. See *Columbia Assoc, LP v Dep't of Treasury*, 250 Mich App 656, 678; 649 NW2d 760 (2002) (explaining that a party must provide supporting authority for its claims and must develop its arguments).

-14-

contractual indemnity, rather than common-law indemnity, an award of attorney fees "must be based upon the indemnity agreement in issue." *Hayes*, 106 Mich App at 201. An indemnity agreement need not include an express provision for the recovery of attorney fees; instead, attorney fees may be recovered where the language of the indemnity agreement otherwise unambiguously provides for the recovery of attorney fees. *Redfern*, 146 Mich App at 19. However, this Court has expressed hesitancy to award attorney fees under an indemnity provision when an award of attorney fees is not expressly included in the contract. See *id.*

To resolve this issue, an examination of three cases decided by this Court is instructive. In the first case, *Hayes*, 106 Mich App at 202, the indemnity provision at issue declared that the indemnitor would " 'indemnify, hold harmless and *defend*' " the indemnitee. (Emphasis added). This Court held that such language unambiguously provided that the indemnitor had a contractual obligation to defend the indemnitee, and that the duty to defend included an award of attorney fees. *Id.*

Along a similar vein, this Court in *Redfern*, 146 Mich App at 19-20, found that a broad indemnification provision unambiguously provided for the recovery of attorney fees. In that case, the indemnity provision purported to indemnify the indemnitee " 'against all claims, liabilities, losses, damages *and expenses of every character whatsoever*.' " *Id.* at 19. Based on this broad, encompassing language, this Court upheld the trial court's award of attorney fees under the indemnity provision. *Id.* at 19-20.

This Court's decision in *Beaudin v Michigan Bell Tel Co*, 157 Mich App 185, 189; 403 NW2d 76 (1986), represents a decision where this Court held that the indemnity provision at issue did not include attorney fees. In that case, the indemnity provision required the indemnitor to hold harmless the indemnitee from specifically enumerated claims such as libel, slander, or copyright infringement, and also provided indemnification "against all other claims . . . ." *Id.* at 186-187. Based on this language, this Court rejected the notion that the indemnitee would be entitled to its defense costs in the underlying lawsuit. *Id.* at 189. This Court reasoned that the phrase "all other claims" "does not expressly allow indemnification for attorney fees, costs or any other expense." *Id.* In reaching this holding, this Court distinguished its decision in *Redfern*, noted above. *Id.*

Examining the attorney fees and costs awarded to Williams & Williams, we find that the plain language of the indemnity agreement does not evidence an intent to hold Dan's Excavating liable for Williams & Williams' attorney fees and costs. Similar to the provision at issue in *Beaudin*, the language at issue here only purported to hold Williams & Williams harmless from "all claims"; it did not include any broader language. See *Beaudin*, 157 Mich App at 189. Further, in contrast to *Redfern*, 146 Mich App at 19-20, the indemnity provision at issue is not so broad as to provide indemnification for any and all expenses of every character whatsoever; rather, the indemnification is limited to "any and all claims." And, in contrast to *Hayes*, 106 Mich App at 202, the indemnity provision at issue does not include language creating a duty to *defend* the indemnitee. Consequently, we hold that the language used in the indemnity provision in the case at bar was not intended to include attorney fees incurred in an action by Williams & Williams. As such, we decline to interpret this language as evidencing an intent to pay attorney fees and costs associated with those claims and hold that trial court erred by requiring Dan's Excavating to pay Williams & Williams' costs and attorney fees.

Turning next to the attorney fees and costs awarded to HFP, the record is unclear as to the basis of the trial court's award. To the extent the trial court found that the indemnity provision contained in the Property Use Agreement created direct liability between HFP and Dan's Excavating for attorney fees and costs, such a conclusion was erroneous. HFP was not a party to this agreement, and the agreement does not support such an award. Nor does any other agreement support an award of attorney fees and costs against Dan's Excavating. Further, although we note that the Lease Agreement required Williams & Williams to pay HFP's attorney fees in the event that HFP successfully brought an action against Williams & Williams under the Lease Agreement, such a provision could not require Dan's Excavating to pay HFP's attorney fees as it is undisputed that Dan's Excavating was not a party to the Lease Agreement. Also, any claim for attorney fees and costs against Williams & Williams for its breaches of the Lease Agreement cannot be said to arise out of Dan's Excavating's operations on the property. Thus, there is no support for the trial court's decision to require Dan's Excavating to pay HFP's attorney fee and costs.

We reverse the trial court's order requiring Dan's Excavating to pay Williams & Williams' and HFP's attorney fees and costs.

III. HFP'S CROSS-APPEAL

On cross-appeal, HFP argues that the trial court erred when it declined to impose liability against both Dan's Excavating and Williams & Williams for HFP's claims in this case. As addressed in detail above, given the undisputed facts and those determined by the trial court, Dan's Excavating is not subject to direct liability to HFP other than for damage to the stone surface of the subject property, and the trial court erred to the extent it held Dan's Excavating directly liable to HFP for any breaches of the Lease Agreement by Williams & Williams. With regard to Williams & Williams, HFP is correct to the extent it contends it is entitled to an assessment of Williams & Williams' liability to HFP. As discussed above, the trial court did not make any discernible findings regarding whether Williams & Williams breached its obligations to HFP under the Lease Agreement. Because the issue of whether the facts presented constitute a breach of contract is a question of fact to be decided by the trial court, *Chelsea Investment Group LLC v Chelsea*, 288 Mich App 239, 251; 792 NW2d 781 (2010), and because the trial court failed to make the requisite findings, we remand for the trial court to make findings of fact with regard to whether Williams & Williams is liable to HFP for HFP's claims under the Lease Agreement, see *City of Jackson v Thompson-McCully Co, LLC*, 239 Mich App 482, 489; 608 NW2d 531 (2000) (remanding where the trial court failed to make findings of fact on an issue).

IV. WILLIAMS & WILLIAMS' CROSS-APPEAL

Lastly, Williams & Williams cross-appeals the trial court's order dismissing its common-law indemnity claim. The trial court initially granted Dan's Excavating's motion for a directed verdict on this issue. "We review de novo a ruling on a motion for a directed verdict." *Coates v Bastian Bros, Inc*, 276 Mich App 498, 502; 741 NW2d 539 (2007). "The motion is properly granted if, viewing the evidence in a light most favorable to the nonmoving party, reasonable minds cannot differ." *Id.* at 502-503.

A party's right to common-law indemnification "exists independently of statute, and whether or not contractual relations exist between the parties, and whether or not the negligent person owed the other a special or particular legal duty not to be negligent." *Botsford Continuing Care Corp v Intelistaf Healthcare, Inc*, 292 Mich App 51, 62; 807 NW2d 354 (2011) (citations and quotation omitted). The right is "based on the equitable theory that where the wrongful act of one party results in another party's being held liable, the latter party is entitled to restitution for any losses." *Lakeside Oakland Dev, LC v H & J Beef Co*, 249 Mich App 517, 531; 644 NW2d 765 (2002). The right of common-law indemnification only exists where a party is held liable to another through no fault of its own. *Botsford Continuing Care Corp*, 292 Mich App at 62. This Court has explained:

> "Common-law indemnity is intended only to make whole again a party held vicariously liable to another through no fault of his own. This has been referred to as 'passive' rather than 'causal' or 'active' negligence." [*Peeples v Detroit*, 99 Mich App 285, 292; 297 NW2d 839 (1980).] "It has long been held in Michigan that the party seeking indemnity must plead and prove freedom from personal fault. This has been frequently interpreted to mean that the party seeking indemnity must be free from active or causal negligence." *Langley v Harris Corp.*, 413 Mich 592, 597, 321 NW2d 662 (1982). Therefore, a common-law indemnification action "cannot lie where the plaintiff was even .01 percent actively at fault." *St. Luke's Hospital v Giertz*, 458 Mich 448, 456, 581 NW2d 665 (1998); see also *Paul v Bogle*, 193 Mich App 479, 491, 484 NW2d 728 (1992) (observing that "common-law indemnity . . . require[s] that the person seeking indemnification be free from any active negligence"). [*Id.* at 62-63.]

This Court looks to the primary plaintiff's complaint to determine whether there are any allegations of active negligence against the party seeking common-law indemnification for purposes of determining whether a right to common-law indemnification is available. *Id.* at 63. "If the primary plaintiff's complaint contained any allegations of active negligence, rather than merely allegations of passive negligence, common-law indemnification is not available." *Id.*

A review of HFP's complaint, as well as the evidence presented to the trial court, demonstrates that the trial court did not err when it granted Dan's Excavating's motion for a directed verdict on Williams & Williams' common-law indemnity claim. HFP's complaint alleged several instances of active negligence on the part of Williams & Williams. Most notably, the complaint alleged that Williams & Williams "failed and refused to take necessary steps to control erosion and dispersion of the soil by wind and precipitation." Moreover, the record reveals undisputed evidence that Williams & Williams refused to take action to control soil erosion and dispersion despite HFP's requests. Thus, Williams & Williams cannot show that it was free from fault, or that the underlying complaint did not allege active negligence against it, and therefore, reasonable minds could not differ on the issue of whether Dan's Excavating was entitled to a directed verdict on this issue. *Botsford Continuing Care Corp*, 292 Mich App at 62; *Coates*, 276 Mich App at 502-503.

## V. CONCLUSION

We affirm the trial court's judgment to the extent it imposes liability on Dan's Excavating for repairing damage to the stone surface of HFP's property. We also affirm the trial court's order dismissing Williams & Williams' common law indemnity claim, as well as the order denying HFP's request to hold *both* Williams & Williams and Dan's Excavating liable for any judgment entered in HFP's favor. Because of the undisputed facts and those found by the trial court, and in light of the plain language of the indemnity clause in the Property Use Agreement, we reverse the trial court's judgment imposing liability and assessing damages against Dan's Excavating for HFP's unpaid rent, HFP's costs incurred in maintaining the soil pile, Williams & Williams' costs incurred in removing the soil, Williams & Williams' costs incurred in testing the soil, and the award of costs and attorneys fees against Dan's Excavating and in favor of HFP and Williams & Williams. On remand, the trial court must make findings of fact and conclusions of law regarding whether HFP has met its burden of proving its claims against Williams & Williams; the court must also award appropriate damages based on its findings. Further, the trial court must enter an order requiring Williams & Williams to repay any money it received from the escrow account funded by Dan's Excavating with regard to soil removal and declaring that Dan's Excavating is entitled to keep the remaining amount in escrow. In light of the analysis set forth above, we also reverse the trial court's imposition of court costs and interest against Dan's Excavating.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Cynthia Diane Stephens
/s/ Michael J. Talbot
/s/ Jane M. Beckering