*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL MCCALL,

      Plaintiff-Appellant,

v

WC HOCKEY, LLC and DANIEL ISRAEL,

      Defendants-Appellees.

UNPUBLISHED
April 13, 2026
11:19 AM

No. 375355
Muskegon Circuit Court
LC No. 2021-003340-CK

Before: O'BRIEN, P.J., and FEENEY and WALLACE, JJ.

PER CURIAM.

Plaintiff, Michael McCall, appeals as of right the final stipulated order in which the parties agreed to dismiss plaintiff's remaining claim against defendant pursuant to a settlement agreement reached by the parties. On appeal, plaintiff challenges an earlier order in which the trial court partially granted a motion for summary disposition filed by defendants, WC Hockey, LLC and Daniel Israel, under MCR 2.116(C)(10). We affirm.[1]

## I. BACKGROUND

WC Hockey and Israel are (or were) the owners of an amateur hockey team, the Muskegon Lumberjacks. Prior to May 2018, plaintiff did some consulting work for the Lumberjacks, after which Israel asked plaintiff to become more involved in the Lumberjacks' operations. Plaintiff accepted and eventually began working for the Lumberjacks fulltime as the president of

---

[1] It is debatable whether this Court has jurisdiction over this appeal as one of right under MCR 7.203(A)(1) because the final judgment being appealed is a stipulated order in which plaintiff did not reserve the right to appeal the trial court's earlier ruling. See *Kocenda v Archdiocese of Detroit*, 204 Mich App 659, 666; 516 NW2d 132 (1994). We decline to address this jurisdictional issue and instead treat plaintiff's "claim of appeal as an application for leave to appeal and grant it." *In re Morton*, 258 Mich App 507, 508 n 2; 671 NW2d 570 (2003).

-1-

operations.[2]  In April 2019, the parties signed an employment agreement that set out plaintiff's base pay and incentives.  This agreement was through the end of May 2021, though plaintiff claimed that the parties discussed the possibility of extending the agreement beyond the initial two-year term because, according to plaintiff, Israel wanted to ensure that plaintiff's replacement was properly trained so that "the success that [they] had had" did not go to waste.

Throughout plaintiff's time with the Lumberjacks, plaintiff and Israel discussed, in plaintiff's words, the possibility of plaintiff "receiving some kind of an upside upon the sale of the team . . . ."  Plaintiff claimed that he and Israel eventually agreed to what the terms of that upside would be in a series of emails.

In March 2019, Israel sent plaintiff an email in which Israel discussed the possibility of plaintiff receiving a share of proceeds if he assisted in selling the team, with the amount of plaintiff's share increasing if the sale of the team reached certain benchmarks.  On December 10, 2020, plaintiff sent Israel an email seeking "to crystalize" the amount of compensation that plaintiff would receive if he "broker[ed]" the sale of the team.  Consistent with Israel's March 2019 email, plaintiff proposed that, the higher the team's sale price, the larger plaintiff's commission would be.  An email chain shows that Israel forwarded plaintiff's proposal to the co-owner of the Lumberjacks, who responded with "looks ok."  Israel forwarded this response to plaintiff, who responded that he would "put a one sheeter together," in reply to which Israel wrote, "I am excited to partner with you on this venture.  Please take ownership of the process."  Plaintiff confirmed that it was his understanding that the parties agreed to terms in these emails.  Israel also confirmed that he and plaintiff agreed that "if the team was sold, [Israel would] give [plaintiff]" some amount of money.  But Israel clarified that this was conditioned not only on plaintiff's brokering a sale of the team but also on his continued employment with the team.

Before plaintiff was able to broker the sale of the team, he resigned.  Plaintiff testified that he decided to resign after discovering that Isreal "went to [plaintiff's] number 2 . . . and asked her if she was ready to take over the team."  The person that plaintiff was referring to as his "number 2" was Andrea Rose.  Plaintiff testified that he discovered that Israel asked Rose this when Rose told plaintiff about the conversation.  According to plaintiff, Israel's asking Rose to take over "without discussing it with" plaintiff first "forced [him] to resign" because Isreal's actions "broke the trust that" Israel and plaintiff "had built for 3 years."

Rose testified that she assumed the role of president of operations of the Lumberjacks on February 1, 2021, but she accepted the position on January 24 of that year.  According to Rose, by the time she even interviewed for the position, plaintiff "had already quit."  Rose testified that, before plaintiff left, he and Rose had conversations about Rose eventually taking over plaintiff's position, and plaintiff would include her in conversations that he thought would be valuable "learning experiences."

---

[2] Israel explained that, technically, plaintiff was employed by "BC Hockey," which "runs the operations of the team" and is "the employer."  WC Hockey, according to Israel, "owns the membership rights to the team." (Dep II, 18, 20.)  No one has argued that this makes any difference for purposes of this lawsuit.

Plaintiff testified that, after he resigned, Israel spoke with the Muskegon "city manager, Frank Peterson," and asked that Peterson not hire plaintiff to do any work with the city until the current litigation was over. Plaintiff was aware of this conversation because, according to plaintiff, Peterson told him about it. Plaintiff claimed that this took place "a month or 2 after" he resigned, likely around February or March. Plaintiff explained that he was not applying for "a specific job" with the city at the time, but he was in "conversations about" being hired to "manage" the arena that the city owned (and where the Lumberjacks played) because of plaintiff's experience. "The things that were being discussed," according to plaintiff, "were potential oversight consulting or management of the arena, the farmers market, and possibly some special events." Plaintiff could not say whether this would have been a full-time job or consulting work. Plaintiff also admitted that he was hired to do some consulting for the city with respect to its farmers market in June 2021, and that Israel's conversation with Peterson took place before this.

Plaintiff filed the complaint giving rise to this action on August 23, 2021. As relevant to this appeal, plaintiff's complaint alleged that (1) defendants breached a contract with plaintiff in which defendants agreed to pay plaintiff for his efforts in assisting the sale of the team and (2) Israel tortiously interfered with plaintiff's expectation of a business relationship with the City of Muskegon.

Defendants moved for summary disposition on January 4, 2023. As relevant to this appeal, defendants conceded that, viewed in the light most favorable to plaintiff, the evidence supported that a "contract was formed on December 10, 2020, that would have provided [plaintiff] with an opportunity to earn a commission on the sale of the Lumberjacks, if he continued in the Lumberjacks employment to build up the value of the team and if he brokered the sale." (Emphasis omitted.) Neither of these conditions were met, defendant argued, so assuming that this contract existed, plaintiff failed to satisfy the conditions precedent to receive his commission, so his claim premised on this contract failed. As for plaintiff's claim for tortious interference with a business expectancy, defendants contended that plaintiff could not establish that Israel interfered with plaintiff's business relationship with Muskegon because (1) plaintiff received a contracting job with the city after Isreal's supposed interference, (2) plaintiff never applied for the job that he claims he would have been hired for without Israel's interference, and (3) if plaintiff's job with Muskegon would have involved operation of the ice arena where the Lumberjacks played, then Israel had a legitimate interest in not wanting a "former disgruntled employee" in that position.

Plaintiff responded on March 28, 2023, arguing that there was "at minimum . . . an issue of fact concerning whether Defendants breached" the parties agreement that defendants would pay plaintiff a cut of the sale of the team if it sold because they had repeatedly promised this to plaintiff, and the team sold shortly after plaintiff was "force[d] . . . to resign." As for his tortious interference with a business expectancy claim, plaintiff contended that he presented evidence establishing all of the elements because he was clearly qualified to manage the arena where the Lumberjacks played given his experience with the team; Israel knew of this expectancy; Israel intentionally interfered with plaintiff's business expectancy by contacting the city and instructing it to not hire plaintiff; and plaintiff was damaged by this because "[h]e lost opportunities for which he was qualified."

The trial court issued a written opinion and order granting defendants' motion for summary disposition as to the two claims at issue in this appeal. For plaintiff's breach-of-contract claim at

issue on appeal, the court reasoned that, viewing the evidence in the light most favorable to plaintiff, there was evidence that the parties had a contract in which plaintiff would be paid "an equity ownership interest" if certain conditions were met, but those conditions had not been met. Namely, plaintiff was to be paid a commission for his "services in brokering the sale of the team," the court explained, but there was no evidence that plaintiff "had anything to do with selling the team." The court accordingly concluded that defendants were entitled to have their motion for summary disposition granted as to plaintiff's claim that defendants breached an agreement to pay plaintiff "an equity ownership interest."

The trial court also concluded that defendants were entitled to have plaintiff's claim of tortious interference with a business expectancy dismissed. Plaintiff's evidence, in the court's opinion, showed at most that he was in "negotiations with the city," which does not rise to the level of a reasonable expectancy. The court alternatively reasoned that plaintiff was hired by the city after the supposed interference, "and he has not argued or shown that he suffered any damages from a delay in hiring."

This appeal eventually followed.

## II. STANDARD OF REVIEW

A trial court's decision to grant or deny summary disposition is reviewed de novo. *Neal v Wilkes*, 470 Mich 661, 664; 685 NW2d 648 (2004). The trial court entered the order at issue on appeal under MCR 2.116(C)(10). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). A (C)(10) motion is properly granted if, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10).

## III. BREACH OF CONTRACT

Plaintiff first argues that the trial court erred by dismissing his breach-of-contract claim in which defendants purportedly agreed that, in exchange for plaintiff's brokering the sale of the team, defendants would pay plaintiff some percentage of the sale amount. A contract is formed when there is an offer and unambiguous acceptance "in strict conformance with the offer." *Pakideh v Franklin Commercial Mortgage Group, Inc*, 213 Mich App 636, 640; 540 NW2d 777 (1995). The trial court concluded that, when the evidence is viewed in the light most favorable to plaintiff, the parties had a contract in which plaintiff would be paid some amount of money if he brokered the sale of the team.[3] But the court nevertheless dismissed plaintiff's claim because, even when the evidence is viewed in the light most favorable to plaintiff as the nonmoving party, plaintiff failed to satisfy the contract's terms. We agree.

---

[3] Defendants do not dispute for purposes of this appeal that, when the evidence is viewed in the light most favorable to plaintiff, a reasonable factfinder could conclude that the parties had a binding contract.

-4-

Under the terms of the parties' alleged contract, plaintiff's brokering the sale of the team was a condition precedent for defendant's performance of the contract—if plaintiff brokered the sale of the team, then defendant would pay plaintiff a percentage of the total sale amount. A condition precedent "is a fact or event that the parties intend must take place before there is a right to performance." *Harbor Park Market, Inc v Gronda*, 277 Mich App 126, 131; 743 NW2d 585 (2007) (quotation marks and citations omitted). If a condition precedent is not satisfied, then "there is no cause of action." *Id*. Here, it is undisputed that plaintiff did not broker the sale of the team, so he failed to satisfy the condition precedent to receiving payment, and he has "no cause of action." *Id*.

A condition precedent need not always be satisfied, however, and plaintiff contends that this is one of those times. "Where a party prevents the occurrence of a condition, the party, in effect, waives the performance of the condition." *Id*. at 131-132. This generally requires "some affirmative action" that prevents the condition from occurring, or a refusal "to take action required under the contract." *Id*. at 132.

Plaintiff contends that defendants prevented him from satisfying the condition precedent by constructively discharging him. "A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Hammond v United of Oakland, Inc*, 193 Mich App 146, 151; 483 NW2d 652 (1992). Stated differently, a constructive discharge is established "when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign." *Vagts v Perry Drug Stores, Inc*, 204 Mich App 481, 487; 516 NW2d 102 (1994) (quotation marks and citation omitted).

Plaintiff on appeal highlights his testimony in which he gave two reasons that he felt compelled to resign: (1) Israel was not paying plaintiff money "that he owed [plaintiff] and had promised [him]" and (2) Israel asked Rose "if she was ready to take over the team." On the first point, plaintiff never claimed that any of the money that Israel was allegedly refusing to pay plaintiff related to plaintiff's employment. On the second point, plaintiff acknowledged that he had spoken with Israel about plaintiff training his replacement, and Rose confirmed that plaintiff had taken steps to train her to replace him. Additionally, plaintiff's employment contract was set to expire in May 2021—four months from when Israel allegedly spoke to Rose.

Given this context, a reasonable person in plaintiff's position would not feel compelled to resign. With respect to the money that Israel allegedly owed plaintiff, plaintiff did not contend that this had anything to do with his employment. It was, at most, a personal debt that Israel was refusing to honor, and plaintiff never explained how this had any effect on his working conditions. As for Israel asking Rose "if she was ready to take over the team," plaintiff was aware that Israel intended for Rose to eventually take over for him, and, when Israel supposedly spoke with Rose about doing so, plaintiff's employment contract with the team was set to expire in a matter of months. In this context, even when the evidence is viewed in the light most favorable to plaintiff, Israel asking Rose if she was ready to replace plaintiff would not make a reasonable person feel compelled to resign. Accordingly, plaintiff failed to create a question of fact whether he was constructively discharged.

Assuming that plaintiff's continued employment was a condition precedent to the parties' alleged contract, it was only one of the conditions precedent. The more significant condition precedent was plaintiff's brokering the sale of the team. Plaintiff technically could have still brokered the sale of the team after being constructively discharged, so defendants did not prevent *this* condition precedent from occurring, even if defendant constructively discharged plaintiff.

The trial court therefore properly dismissed plaintiff's breach-of-contract claim.

## IV. TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY

The trial court also dismissed plaintiff's claim for tortious interference with a business expectancy. The elements of tortious interference with a business expectancy are (1) "the existence of a valid business relationship or expectancy," (2) "knowledge of the relationship or expectancy on the part of the defendant," (3) "an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy," and (4) "resultant damage to the plaintiff." *Badiee v Brighton Area Schools*, 265 Mich App 343, 365-366; 695 NW2d 521 (2005) (quotation marks and citation omitted).

The trial court concluded that plaintiff had only presented evidence of his general negotiations with the city, which do not rise to the level of a business expectancy. We agree. Plaintiff testified that he was in discussions with the city manager, Peterson, about taking on a consulting or managing role in which plaintiff would oversee the operations of the city's convention center. According to plaintiff, Peterson believed that plaintiff was qualified for the role given plaintiff's experience with the Lumberjacks. This establishes, at most, that Peterson and plaintiff discussed how plaintiff may be a good fit to assist the city in managing the convention center given plaintiff's prior experience. While no doubt positive for plaintiff, it would be unreasonable for plaintiff to have any valid business expectancy from these nascent negotiations.

Even if plaintiff did have a valid business expectancy, he failed to produce any admissible evidence that Israel interfered with it. Plaintiff testified that Peterson told him that Israel asked Peterson not to employ plaintiff in a position managing the arena, but anything that Peterson told plaintiff is hearsay. "Hearsay" is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c).[4] "Hearsay is not admissible except as provided by these rules." MRE 802.[5] Plaintiff does not identify any exception under which Peterson's hearsay statement would be admissible, so plaintiff's testimony about what Peterson told plaintiff that Israel said would not be admissible to prove that Israel told Peterson not to employ plaintiff.

The trial court also reasoned that plaintiff would not be able to show that he suffered any damages from Israel's alleged interference because plaintiff was subsequently hired by the city for

---

[4] This was the version of MRE 801 in effect when the trial court decided defendants' motion; it has since been amended.

[5] This was the version of MRE 802 in effect when the trial court decided defendants' motion; it has since been amended.

a temporary consulting job. Plaintiff is adamant on appeal that this was erroneous because plaintiff took this consulting job before Israel's interference. But plaintiff clearly testified that Israel told Peterson not to hire plaintiff in February or March 2021, and that the city hired plaintiff for consulting work in June 2021. Indeed, plaintiff testified that he was hired after Israel spoke with Peterson. More generally, plaintiff never identified any job he applied for with the city for which he was not hired, nor did plaintiff explain what work he would have done for the city but for Israel's interference (let alone what he would have been paid for that work). For all these reasons, we agree with the trial court's conclusion that plaintiff failed to establish that he was damaged by Israel's alleged interference with plaintiff's business expectancy.

The trial court therefore did not err by dismissing plaintiff's claim for tortious interference with a business expectancy.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney
/s/ Randy J. Wallace